Filed 5/1/13 (unmodified opinion attached)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S093756 |
| v. | ) | |
| | ) | |
| COREY LEIGH WILLIAMS, | ) | |
| | ) | Contra Costa County |
| Defendant and Appellant. | ) | Super. Ct. No. 961903-2-02 |
| _____ | ) | |

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed February 7, 2013, and appearing at 56 Cal.4th 165, is modified as follows:

Footnote 14 on page 188 of 56 Cal.4th at page 188 is modified to read as follows:

Defendant contends the questioning by White and Reed went beyond their normal intake duties.  The record does not support this claim. While Reed acknowledged that a more thorough investigation would follow the initial decision to place an inmate in segregated housing, he also testified that he would explore inmates' reasons for safety concerns at the intake interview.  Indeed, defense counsel conceded at the suppression hearing that White and Reed were "totally within their function" when they pressed defendant about the reason for his apprehension, and could not be expected to simply take an inmate's word on the need for segregated housing.  Counsel argued that the questioning was proper, but nevertheless inadmissible under *Morris*, *supra*, 192 Cal.App.3d at pages 389–390.

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)            S093756
      v. )
)
COREY LEIGH WILLIAMS, )
)       Contra Costa County
      Defendant and Appellant. )   Super. Ct. No. 961903-2-02
_____)

Defendant Corey Leigh Williams was convicted of the first degree murders of Maria Elena Corrieo and Maria Eugenia (Gina) Roberts.[1] The jury returned true findings on the special circumstances of multiple murder and murder in the commission of burglary and robbery.[2] It found that defendant personally used a firearm in both murders,[3] and that his codefendant was armed with a firearm.[4] Defendant was also convicted of two counts of first degree robbery and one count of first degree burglary, all with personal firearm use, arising from the same incident.[5]

---

[1] Penal Code section 187. Further statutory references are to the Penal Code unless otherwise indicated.

[2] Section 190.2, subdivision (a)(3) and (17).

[3] Section 12022.5, subdivision (a).

[4] Section 12022, subdivision (a)(1). The codefendant, Dalton Lolohea, was tried separately, found guilty, and sentenced to life in prison without parole.

[5] Sections 211, 212.5, 459, 460, subdivision (a).

Defendant was given the death penalty.**6**  This appeal is automatic.  We affirm the judgment.

## I.  FACTS

### A.  *Guilt Phase*

#### 1.  *Prosecution*

Maria Elena Corrieo, age 74, lived with her disabled daughter, Gina Roberts, age 53.  Mrs. Corrieo owned a restaurant in Concord, and did not trust banks.  When the restaurant closed each evening she would take the paper currency home in her apron.  Periodically she would consolidate the proceeds into $100 bills, which she kept in her car.

The victims were discovered by another of Mrs. Corrieo's daughters, Lili Williams, on August 16, 1995.  Williams had last seen Corrieo and Roberts the previous evening at the restaurant.  Several times the following day she called the restaurant and was concerned to learn her mother was not there.  Williams and her ex-husband drove to Corrieo's house, where they found her car parked at an unusual angle and items lying on the ground nearby.  The front door of the house was open.  Williams found Corrieo and Roberts on the floor.  After hugging and trying to comfort them, Williams realized they were dead.  The phone lines had been cut, but Williams's ex-husband was able to flag down a police officer.

Contra Costa County criminalists examined the crime scene.  Both Corrieo and Roberts had their hands tied behind their backs.  They had been shot in the head.  Bullets were embedded in the floor beneath them, and blood spatters also

---

**6**     The court also sentenced defendant to a total term of eight years on each of the robbery and burglary counts, with the firearm use enhancements.  The sentences on the robbery counts were stayed pending execution of the death sentence, and the sentence on the burglary count was stayed under section 654.

2

indicated they had been shot "in place." Three .40-caliber Smith & Wesson cartridge casings were found near Corrieo, and four near Roberts. The parties stipulated that the murder weapon was People's exhibit No. 11, a Glock .40-caliber semi-automatic pistol. Autopsies revealed that the victims died from their gunshot wounds. Fragments of a bullet lodged in Corrieo's head weighed approximately the same as a .40-caliber Smith & Wesson bullet.

David Ross was the principal prosecution witness. He admitted participating in the crimes along with defendant and Dalton Lolohea, and testified that defendant was the shooter. Ross's credibility was therefore critical, and highly contested at trial.

Lolohea, Ross, and defendant were friends. Lolohea told Ross he knew of a car with $30,000 in the trunk. A cook in Mrs. Corrieo's restaurant was the source of the information. On the night of the murders, Ross met Lolohea and defendant, and the men agreed to break into the car. They drove to Ross's house, where he kept a .40-caliber Glock pistol. He testified that it was the same pistol as People's exhibit No. 11, or "almost identical" to it. The men had ski masks, and Ross gave them socks to use as gloves. They found Corrieo's car at the restaurant, but decided not to break into it there. Instead, they followed the victims home, planning to coerce them into revealing where the money was. On the way they donned the masks and put the socks on their hands. They agreed to address one another as "Baby," to shield their identities. Defendant had the pistol.

At Corrieo's house, defendant and Lolohea forced the victims inside while Ross searched their car. He "threw everything" from the victims' car into Lolohea's car. When Ross entered the house, the victims were lying facedown on the floor. Defendant stood over them, holding the pistol. Ross and Lolohea ransacked the house looking for a safe or cashbox, then took a large television to Lolohea's car. They returned to the house, where Ross said to defendant, "C-Dog,

3

ask them where the money's at." Defendant yelled at Ross, "Don't fucking call me by my name. . . . Don't call me C-Dog."[7]

As they were tying the women's hands, Roberts struggled to her knees, protesting. Ross kicked her in the back. At his direction, defendant hit Roberts "full force with his fist in her face, hit her about three or four times. Then she fell down." Thinking they were finished, Ross said to Lolohea, "Let's go." Lolohea told Ross to get in the car. He said he and defendant would make sure the phone lines were cut and the victims "wasn't going anywhere for a while." Ross sat in the car for a few minutes, heard a gunshot, and saw Lolohea run outside. By the time Lolohea reached the car, Ross heard three more shots. A minute later defendant ran from the house and jumped into the car. Ross asked him, "What did you do in there?" Defendant said he "shot them bitches." Ross asked why. Defendant responded that he shot them because they heard Ross call him "C-Dog."

The men drove to Walnut Creek and left the television set with a friend, saying Ross would pick it up the next day. Next, they drove to a hangout of theirs, an isolated parking lot in an industrial area of Concord known as "Stanwell." There they searched the material they had stolen. Defendant found the money. They "high-fived," and drove to Ross's house to divide the take. Ross managed to skim off $4,000 before they split the remaining $36,000.[8] He gave his sister $500 and asked her to hide his ski mask and black sweater.

The next day Ross and defendant went to a mall where defendant bought a bracelet for his girlfriend, Wendy Beach. They drove to Beach's house and

---

[7] At trial it was stipulated that "C-Dog" was tattooed on defendant's hands.
[8] The exact amount of the money taken is unclear. According to Ross, it was between $40,000 and $50,000.

4

defendant gave her the bracelet. Eventually, Ross gave the murder weapon to his friend Clemus West, telling him to "get rid of it."

Ross testified before the grand jury with the understanding that he would not be subject to the death penalty for these crimes. Afterward, he was offered a term of 25 years to life. He declined on the advice of counsel, and eventually pled guilty in return for a 20-year sentence.

On cross-examination, Ross admitted lying to the police repeatedly, at first denying and then minimizing his involvement in the crimes. He said it was "all a lie" when he told the police "all of the stories . . . about not really knowing what was going on, and not wanting to be part of it, and that it was all a big surprise to [him] when [he] showed up at this house." Ross also conceded that he had not been forthcoming about his past criminal activity when he testified before the grand jury. He had admitted a theft conviction, but failed to mention crimes that apparently did not lead to convictions: shooting at an occupied vehicle, robbery, and burglary, as well as selling crack cocaine and stolen property.

Ross testified that when the police first questioned him, they assured him they did not think he committed the murders and believed he may not have even known that anyone would be robbed, much less killed. During that session, before his arrest, the officers permitted Ross to confer with Lolohea for 14 minutes. Whispering in case the conversation was being recorded, Ross told Lolohea he had lied to the police to protect him. "I told the police you were in the car [when the shots were fired] to make it easier on you."

Bernadette Ross was Ross's younger sister. She testified that one evening Ross gave her $500 and asked her to hide a ski mask for him. He told her that he, defendant, and Lolohea had robbed two women of around $40,000. He said defendant, whom she saw in Ross's room that night, had killed the women. Ross also told her they had burned some items "in Stanwell."

5

Deborah Hall worked at a business on Stanwell Drive in Concord. The morning after the murders she noticed burned rubble in an adjoining alley. Among the charred materials were a matchbook cover and order pad stubs from Corrieo's restaurant, and a collectible automobile card. Sergio Corrieo testified that he had given the card to his mother the night she was murdered.

Wendy Beach confirmed that the day after the murders, defendant came to her house with Ross and gave her a bracelet. Defendant was arrested on unrelated charges later that day. He called Beach from jail and asked her to go to a friend's house to pick up some money he had left there. She collected over $20,000, which was recovered by police officers when they executed a search warrant at her home.

Aziz Al-Ouran testified that he purchased a Glock pistol, similar to the murder weapon, from Clemus West.

A criminalist went to Tijuana to examine a car, and found Lolohea's fingerprints on items inside. The parties stipulated that transfer material found on several areas underneath the trunk lid came from the stolen television set. They also stipulated that a heel print found at the crime scene matched a boot belonging to Lolohea.

Defendant was moved from San Quentin to Folsom Prison in December 1996, after he was charged with the murders. Upon his arrival at Folsom, he was recognized by Sergio Corrieo, the son and brother of the victims. Sergio had been incarcerated for felony drunk driving, and his work assignment included helping guards process new inmates. When he saw defendant, Sergio asked to be relieved of duty, telling his supervisor that defendant "was a suspect in my family's murder and that I didn't want to do anything stupid." Sergio was placed by himself in a nearby room, where he learned from a coworker that defendant was in an adjoining cell. The solid metal door between the two rooms had a three-inch gap at the bottom. Sergio got down on his hands and knees and called to defendant

6

through the gap.  Defendant responded.  Sergio asked him, "Do you remember Maria Elena Corrieo?"  Defendant paused, then replied, "Yeah."  Sergio said, "You're a dead man, mother fucker."

During his subsequent intake interview, defendant told the officers on duty, "I need to lock up."  They understood him to mean that his life was in jeopardy, and he needed to be placed in protective custody.  Asked to explain, defendant said "they are going to stab me," but declined to identify who "they" were.  When asked "why would they stab you?"  defendant replied, "because I killed two Hispanics."  Further details surrounding this admission are discussed *post*, in part II.B.1.

### 2. *Defense*

William Hazelton testified that he and David Ross were housed in the same module of the Contra Costa County jail in the spring of 1996.  Ross once showed Hazelton a photograph of his child and said he did not think he would ever see her again.  Hazelton demurred, "you don't know that."  Ross responded, "Billy, man, I'm here for some serious case. . . .  I wasted these two bitches."

At the time of defendant's trial, Hazelton was serving a sentence of 123 years to life for a home invasion robbery and two bank robberies, with prior convictions.  Hazelton acknowledged that one could gain status in prison by "doing injury to rats and to snitches."  However, he insisted that he would not lie in court and had no animosity toward Ross.

Defendant's mother Teri Barela provided an explanation for his possession of a large sum of cash.  She said she gave defendant $20,000 to $25,000 following the sale of her grandmother's house.  Barela, a prostitute from the age of 12 and a

7

drug addict,**9** was concerned that she was "going through" her inheritance. She told defendant not to return the money until she was clean and sober. Barela did not know whether the money seized in this case was hers. "Possible, but I don't know."

Although Barela would not have trusted defendant "not to steal 20 bucks sitting on [her] bureau," she insisted she did entrust him with $25,000. When previously questioned by an FBI agent, she said the most she had given defendant was $3,000 for a car. She told the agent she would never have given defendant a large sum like $20,000.

Lieutenant Raymond Ingersoll, the lead investigator in this case, confirmed that Ross initially denied, then minimized, his involvement in these crimes. Ingersoll "very much" agreed with defense counsel's characterization of Ross as "changing his story all over the place . . . on virtually every aspect of this case." When Ingersoll initially questioned Ross's sister Bernadette, she provided no relevant information. However, after Ross testified before the grand jury, Ross's attorneys contacted Ingersoll, and Ingersoll questioned Bernadette again. She admitted that Ross had given her $500.

On December 5, 1995, Manuel Hernandez was brutally beaten by three men he confronted for suspicious behavior at a neighbor's house. Another neighbor, James Grady, saw the beating. He saved Hernandez from further injury by warning the attackers that the police were coming. Grady later recognized Ross as the principal assailant when he saw his photograph in the newspaper after his arrest.

---

**9** Barela said she had not engaged in prostitution or drug abuse during the three years before her testimony.

8

B. *Penalty Phase*

      *1. Prosecution*

Danielle DeBonneville, who lived in the same apartment complex as defendant, once heard him fighting with his pregnant girlfriend. DeBonneville and her boyfriend went to see if they could help, and found that defendant had "punched [his girlfriend] in the face and knocked her out." Defendant approached DeBonneville with a bat and threatened kill her if she tried to take his girlfriend to the hospital.

About two months later, DeBonneville was in a park with her boyfriend, a member of the Sureno gang. They were approached by eight to 10 men carrying bats and guns and wearing ski masks and red bandanas, a color associated with the rival Norteño gang. The men asked, "what do you claim?" DeBonneville replied, "We do not claim anything." A man hit DeBonneville in the face. In the ensuing melee, she pulled his mask off and saw that it was defendant. He and the others began "beating me with bats and kicking me, stomping me to the ground. One of them picked me up and tried to break my back. . . . I lost the feelings [in] my legs." One of the men "started trying to pull my pants down," but was unable to do so. DeBonneville estimated that she was "hit or kicked or struck with bats" 40 or 50 times.

The men surrounded DeBonneville, forced her to her knees, and held her hands behind her back. Putting a gun to the center of her forehead, defendant said, "Say good night." DeBonneville managed to free one hand and strike at the gun as it fired, so that the bullet entered her head at the hairline. She heard voices saying, "Oh, my God, is she dead? . . . You shot her man." The assailants fled. The bullet lodged in her skull, and was removed two years later.

Defendant represented himself during the penalty phase. He conducted this cross-examination of DeBonneville: "Q. Do you think that I feel sorry that you

9

were shot? [¶] A. Do I think you feel sorry? [¶] Q. Yes. [¶] A. Yes. [¶] Q. I'm not." There were no further questions.

Alicia Todd testified that she had a romantic relationship with defendant for nine or 10 months. He once punched her in the face during an argument.

Sergio Corrieo testified that his mother had 10 children and 37 grandchildren. She was the nucleus of the family and cared for victim Roberts. After Mrs. Corrieo's death, the family had to sell both her house and her restaurant to pay off the restaurant's liabilities.

### 2. *Defense*

Defendant put on no evidence at the penalty phase. His closing argument was as follows:

"Now that you've heard the aggravating circumstances against me, it's your time to decide if I receive life or death. I'm not going to stand up here and cry or ask you for any sympathy. I know that you've noticed that I don't seem to care what happened with DeBonneville. It's because I actually don't. That is a side of me you'll never understand. But at the same time I regret having assaulted Alicia Todd. She was honestly an innocent victim. I also regret leaving my daughter fatherless. I want to make it clear that I do feel sorry for certain things.

"Either today or tomorrow you will decide my punishment for a crime in which I still claim my innocence. No matter what you decide, I will always be me. You the jury have found me guilty of all counts in this case, and have heard aggravating circumstances. You will notice that I did not put on a defense to show mitigating circumstances of people testifying on my behalf. That's because I don't blame my lifestyle on other people. My actions are my actions and mine alone. I chose the life I lead. It might seem outrageous to you people, but it's a lifestyle that I understand. I would like for you 12 people to have the heart to look me in the eye when you've decided my punishment. At least try to. I want you 12

10

people to try and realize that our frame of mind is not that much different. It's just that I am willing to do whatever I feel needs to be done. I understand there are consequences and repercussions for everything I do in life, and I'm willing to take the chance and deal with the outcome later. So in your deliberations, do as you deem necessary.

"Thank you. That's it."

## II.  DISCUSSION

### A. *Jury Selection*

Defendant contends the excusal of Prospective Juror W.M. for cause was prejudicial error under the federal Constitution. Although the question is somewhat close, we disagree.

A prospective juror in a capital case may be excused for cause if his or her views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Prospective jurors "may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Id*. at p. 425, fn. omitted.) Accordingly, "deference must be paid to the trial judge who sees and hears the juror" and must determine whether the "prospective juror would be unable to faithfully and impartially apply the law." (*Id*. at p. 426; see also *Uttecht v. Brown* (2007) 551 U.S. 1, 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors"].)

" 'On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made

11

statements that are conflicting or ambiguous. [Citations.]' " (*People v. Thomas* (2011) 51 Cal.4th 449, 462.) " 'In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts [Citations.]' " (*Id.* at pp. 462-463.)

We begin with W.M.'s views on the death penalty, as revealed by his answers on the jury questionnaire. Asked to state his general feelings regarding the death penalty, W.M. wrote: "I believe the death penalty is right. I personally would have a difficult time living with the fact I was partially responsible for putting a person to death." He was then asked whether he believed the state should impose the death penalty under four sets of circumstances: (1) the killing of a human being; (2) an intentional killing; (3) a killing during a robbery or burglary; and (4) more than one killing during a robbery or burglary. In each case, W.M. checked the box for "Sometimes." Asked whether the views he expressed in response to this series of questions were based on religious considerations, W.M. checked "Yes."

W.M. was "moderately in favor" of the death penalty, and "strongly in favor" of the penalty of life in prison without parole. In response to another question, he indicated he had actively supported ballot initiatives that reinstated or expanded the death penalty in California. He did not believe in the principle of "an eye for an eye," and he did believe our criminal law was based on that concept. He also thought the death penalty was imposed too randomly.

The court questioned W.M. about a comment on his questionnaire that "too many criminals go free because of a technicality." W.M. said he could set aside

12

that view and base his verdict on the evidence. The court also asked about the death penalty. W.M. gave an affirmative response when the court said it understood he believed life without parole and death were "equal opportunit[ies]" from which the jury could choose. He said he was not "predestined to vote for death or . . . life."[10]

Defense counsel's voir dire was largely directed at another questionnaire response: W.M. wrote that he did not understand why anyone would want to be a criminal defense attorney. He explained that his feelings about the profession were negative. He agreed when defense counsel asked if he might be inclined to "give the guy on this corner [presumably, the prosecutor] a little bit of [a] leg up." However, when asked "would it be fair to say . . . that you don't think you should be on this particular jury?", W.M. responded: "Oh, I have feelings about what should happen, but I mean it's — my own religious convictions, I don't know whether I could actually bring myself to bring to the right conclusions that should be brought." He added, "I mean a person I feel is — well, how should I say? Everybody has got a right to life I guess." Defense counsel asked if that included the victims in this case, and equally the defendant, and W.M. answered in the affirmative.

The prosecutor's voir dire, which we quote in full, focused exclusively on W.M.'s death penalty views.

---

**10**    On his questionnaire, W.M. also said he thought law enforcement was hampered by too many restrictions, that peace officers would not lie under oath, and that he did not want to serve on the jury because he wasn't sure he would not be swayed by the grief of a relative or family member. He was not questioned about these responses.

13

"[Prosecutor:] Mr. [M.], I don't think I understood your views on the death penalty. Were you telling [defense counsel] here a moment ago that you would be unable to impose the death penalty personally?

"[W.M.:] When weighing the evidence, probably I could, yes, if it's in such — but I — my own subconscious, I just don't know. I just don't believe it. Even though I voted for it, I just — my own personal — my own personal being I think it's right, but my own personal being I'd have to pass.

"[Prosecutor:] Okay. So listen, just because you voted for it and agree that it's okay in principle, doesn't mean that's something you'd want to do yourself?

"[W.M.:] Right.

"[Prosecutor:] To use an example, I am pleased to see that the Oakland Raiders got a decent offensive line, but it's not something I could do myself or ever would want to do myself. So that's my question for you, are you telling us that theoretically you're for the death penalty —

"[W.M.:] Right.

"[Prosecutor:] — and you think it ought to be carried out in appropriate cases, but you're not personally going to be the guy to do it? Is that where you stand on the issue?

"[W.M.:] I'd have a rough time doing it, yes.

"[Prosecutor:] If you were actually put into a position where you had to make that decision, would your views make it difficult, or maybe even impossible, for you to actually personally vote to execute someone?

"[W.M.:] Would make it difficult. It would make it difficult. Have to be very careful about that, you know, it was really did deserve it before I could vote for it."

Following the voir dire of another prospective juror, R.H., the court held a sidebar conference at which the prosecutor offered to stipulate to the excusal of

14

W.M, "the one that doesn't like defense attorneys." When the defense declined, the prosecutor challenged W.M. for cause. The refusal to stipulate was somewhat equivocal: defense counsel said, "Can't do it. Let me talk to [cocounsel] about it." The prosecutor immediately lodged his challenge, after which defense counsel offered: "Give me a minute. I could —" The prosecutor, however, said, "That's all right." There was no argument on the merits of the challenge to W.M. The court asked if the defense had any challenges, and counsel identified R.H. After hearing argument on the challenge to R.H., the court commented, "Well, both of you have kind of — you're running jurors through a very fine screen now, which is not really what the scope of voir dire should be. Neither one of these challenges, in my judgment, are meritorious. I'm either going to grant them both or deny them both. I'll let you know when you get back there."

After counsel returned to their tables, the court excused both W.M. and R.H., saying, "All right. . . . Both of you [were] subjected to a long amount of questions. You answered those questions very well, but I think on balance I'm going to excuse both of you. So thank you very much."

Defendant claims W.M. was improperly excused for cause.[11] He contends this case is analogous to *Gray v. Mississippi* (1987) 481 U.S. 648. It is not. There, the court granted a prosecution challenge for cause against a qualified juror because the court believed it had erroneously denied other prosecution challenges. (*Id*. at pp. 655-657.) Nothing of that nature occurred here. The court dismissed

---

**11** At the time of trial, no objection or statement of grounds was required of the defense to preserve this claim of error. We have since prospectively required defendants to "make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal *stating specific grounds* under [*Witherspoon v. Illinois* (1968) 391 U.S. 510 and *Wainwright v. Witt*, *supra*, 469 U.S. 412] in order to preserve the issue for appeal." (*People v. McKinnon* (2011) 52 Cal.4th 610, 643, italics added.)

two jurors for cause, one challenged by the prosecutor and one by the defense, despite a previous comment to counsel that it saw no merit in either challenge.

Notwithstanding the court's sidebar remarks, the record reveals ample grounds for both challenges. Prospective Juror R.H. was clearly excludable for cause, as defendant concedes. When questioned by the defense, R.H. reaffirmed his questionnaire answer that he did not believe life without parole was a legitimate punishment for someone convicted of first degree murder with special circumstances. When the prosecutor pressed him to say he would not automatically vote for death, R.H. replied, "I honestly don't know. It would depend upon the circumstances and whether the individual was found guilty or not." R.H. did eventually respond affirmatively when asked if he could keep an open mind on the penalty determination, assuming a guilty verdict. However, he also said he thought psychiatrists and psychologists were "quacks," and would not judge any evidence they produced by the same standards he would apply to other witnesses. Even setting aside his leanings in favor of the death penalty, R.H.'s bias against mental health experts and unwillingness to evaluate their testimony evenhandedly were sufficient to justify defense counsel's challenge.

There is also sufficient evidence that W.M. would have been substantially impaired in the performance of his duties as a penalty phase juror. W.M. repeatedly expressed extreme discomfort with the prospect of imposing the death penalty, telling the prosecutor at one point that even though he had voted for the death penalty, if personally called upon to carry it out, "I'd have to pass." When the trial court has conducted voir dire and observed a prospective juror's responses to counsel's questioning, we defer to that court's evaluation. We have upheld excusals for cause on similar records. (E.g., *People v. Souza* (2012) 54 Cal.4th 90,

16

123-126 (*Souza*); *People v. Griffin* (2004) 33 Cal.4th 536, 559-560.)[12] "Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 7.)

Defendant, however, contends we may not infer a finding of bias here because the court expressly found that the challenge to W.M. lacked merit. We disagree. The court's comment on the merits of the challenges to W.M. and R.H. was not a finding, but an aside to counsel during a sidebar discussion. The court was evidently frustrated by the manner in which counsel were conducting voir dire. Earlier in the sidebar, with respect to defense counsel's challenge to R.H., the court had noted, "Both of you wasted an awful lot of time on that juror for not getting very much." Its subsequent statement that "neither one of these challenges, in my judgment, are meritorious," followed an observation that counsel were inappropriately "running jurors through a very fine screen." The court clearly had not decided the merits of the challenges at that point. It was still

---

**12**    Defendant relies heavily on *People v. Stewart* (2004) 33 Cal.4th 425, in which we observed that "a prospective juror who simply would find it 'very difficult' ever to impose the death penalty, is entitled — indeed, duty bound — to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror." (*Id*. at p. 446.) In *Stewart*, however, the court excused prospective jurors based solely on their written questionnaires. (*Id*. at p. 444.) Here, the court engaged W.M. in voir dire, and "[u]nder such circumstances, a juror's conflicting or ambiguous answers may indeed give rise to the court's definite impression about the juror's qualifications, and its decision to excuse the juror deserves deference on appeal." (*People v. Tate* (2010) 49 Cal.4th 635, 674, fn. 22; see also *People v. Thomas*, *supra*, 51 Cal.4th at p. 360.)

17

weighing its options, and told counsel it would rule once they returned to their tables.

The court's statement that it would either grant both challenges or deny both may suggest it believed the merits of the challenges were such that it could decide them either way, in the lawful exercise of its discretion. Its comment that neither challenge appeared meritorious may reflect disapproval of counsel's questioning of the prospective jurors. But in any event, defendant's claim that the court expressly found the challenges meritless is belied by the fact that, after an opportunity for reflection, the court proceeded to grant both challenges with solid grounds in the record for doing so.

Presented with ambiguous comments from the bench, we will not draw the strained inference that the court ruled in direct contravention of its own findings and in disregard of the law. Rather, we view the court's sidebar remarks as preliminary musings to counsel. The ruling on the merits that followed must be upheld if fairly supported by the record. Voir dire was extensive in this case, and while W.M.'s statements were sometimes conflicting, we defer to the trial court's ultimate evaluation of his fitness to serve on the jury, as reflected in its grant of the prosecutor's challenge. (*People v. Thomas*, *supra*, 51 Cal.4th at pp. 462-463.)

B. *Guilt Phase Issues*

1. *The Admission of Defendant's Statement in Prison*

Before trial, defendant moved to suppress the admission he made to the Folsom correctional officers at his intake interview. He argued that the statement was involuntary, and also inadmissible under both *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).

Defendant's moving papers set out the circumstances of the admission, which the prosecution did not dispute. Ross and Lolohea were arrested and charged with the Corrieo murders in January 1996. Defendant, then incarcerated

18

in San Quentin, was questioned and denied involvement.  In October he was indicted by a grand jury, charged with capital murder, assigned counsel, and arraigned.  He was then transferred to Folsom on December 19, 1996.  Upon arrival he was recognized by Sergio Corrieo, who was working in the receiving office.  Sergio told his supervisor, Officer Darryl White, about defendant's connection with the murders.  Sergio was placed in a separate area, but was able to speak to defendant through the space under a door.  Sergio asked if defendant remembered Maria Elena Corrieo, and told him, " 'You're a dead man.' "

At the subsequent intake interview, defendant told White and Lieutenant Keith Reed that he needed to "lock up."  However, he refused to say who had threatened him.  His explanation that he had killed two Hispanic women was recorded in White's report.  The report was discovered by investigators when Sergio's sister reported that he had some important information about the case.  Sergeant Raymond Ingersoll interviewed Sergio in Folsom, and learned that Sergio had heard about defendant's admission from White.  Sergio had not told White that he had threatened defendant.

Ingersoll spoke with White, who confirmed the episode.  Reed told Ingersoll that he had responded to defendant's request to be segregated by asking "what his crime was because everyone is there for something."  Reed recalled that after defendant said he had killed two people, he added that he "[ran] with Hispanics" and the shooting was gang related.

Sergio Corrieo testified at the suppression hearing.  He said he was "pretty upset" after recognizing defendant and being removed from the reception area at Folsom.  Sergio had asked a coworker where defendant was being held, which was how he learned that he was in the adjoining cell.  Officer White testified that

19

defendant told him and Reed that "they're going to stab me," but refused to say who "they" were. White then asked, "why are they going to stab you?"**13** Defendant replied, "Because I killed two Hispanics." White's question and the report he wrote were solely for purposes of the intake interview, and not for investigating any crimes defendant may have committed. White took no steps to send the report to any investigating agency.

Lieutenant Reed testified, but had little memory of the interview with defendant. After reviewing Ingersoll's report, he remembered defendant "saying that it was some type of gang-related thing . . . and that, you know, he had safety concerns." When Reed asked defendant what his crime was, he was thinking of the commitment offense, not any other crime that might be the subject of a current investigation. He was surprised when defendant responded by saying he had killed two people. Reed acknowledged, however, that the intake form he received included the entry "hold capital crime," which could have explained defendant's high security classification. He did not forward White's report to any outside agency until the sheriff's department contacted him.

The trial court declined to exclude defendant's admission, reasoning as follows: Reed and White did not know, and had no reason to know, that the questions they posed to defendant were likely to elicit an incriminating statement. They were responding to an immediate prison security problem, brought to their attention by defendant's claim that he had been threatened. Thus, although

---

**13**     At another point in his testimony, White said he thought it was Reed who asked the question. White noted that "[w]e process anywhere from ten to a hundred inmates a night through R[eceiving] and R[elease]. Names and numbers and faces disappear quickly." White said Reed was responsible for questioning inmates to determine their housing placement, and that his own questions were generally limited to ascertaining an inmate's gang affiliation.

20

defendant was "in custody," his intake interview did not amount to "custodial interrogation" for purposes of *Miranda* or *Massiah*.

Defendant claims the court erred. We accept the trial court's resolution of factual issues when it is supported by substantial evidence, and independently review its legal conclusions. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284; *People v. Guerra* (2006) 37 Cal.4th 1067, 1092-1093.)

First, defendant contends his statement to the officers was involuntary because it was coerced by Sergio Corrieo, a state actor working as a prison intake clerk. This argument fails. Although Sergio was working as a clerk when he first saw defendant, he promptly informed Officer White of his problem and was relieved of his duties. When he threatened defendant, he was acting not in any official capacity but on his own initiative. Defendant notes that in *People v. Berve* (1958) 51 Cal.2d 286, this court held a confession involuntary when it followed a beating and threats by the victim's husband. *Berve*, however, is inapposite.

Berve was suspected of performing an abortion leading to the victim's death. He was kidnapped at gunpoint by the victim's husband and taken to a house where other vengeful relatives had gathered. He was told to confess, his life was threatened, and his parents were threatened with harm. For nearly two hours he was beaten, kicked, and subjected to other forms of severe physical abuse. Throughout this period he was told he would be murdered if he did not confess. When the police arrived, Berve was relieved to be rescued. He was taken to the station and interrogated without being given medical attention or even an opportunity to wash. He was given only a cup of water, and during the interview showed "complete temporal disorientation." (*People v. Berve*, *supra*, 51 Cal.2d at p. 289.) Berve moved to suppress the confession this interrogation produced, testifying that he had been "fatigued, numb, confused, and in increasing pain," and

21

" 'would have said "Yes" to anything in the world if they had let me lay down and let me rest.' " (*Id.* at pp. 289-290.)

The *Berve* majority rested its holding on the following analysis: "The precise purpose in threatening the defendant was to force a confession. The two-hour inquisition was to instill in defendant such a fear for his own safety and that of his parents that he would confess to proper authorities although removed from immediate danger. Thus, merely liberating the defendant could not wipe out the threats of violence ringing in his ears if he did not confess. The price exacted for freedom from future reprisals was a confession. Momentary police sanctuary could not still defendant's terror unless accompanied by promises of effective police protection. Only then can there be grounds for assuming that the defendant has freedom of choice." (*People v. Berve*, *supra*, 51 Cal.2d at pp. 292-293.)

Here, by contrast, defendant was neither physically abused nor pressed to confess. He was briefly threatened in the holding cell. Yet Sergio was not in the same cell, and his threat was not linked with a demand for a confession. Defendant initiated the conversation that produced his admission, asking the correctional officers for secure housing. The officers' questions were directed to that purpose. A confession was not the price for a secure prison placement; the officers were simply seeking the information they needed to protect defendant. *Berve* provides no support for defendant's claim that his statement was involuntary.

Defendant also relies on federal cases, claiming the totality of the circumstances indicates his confession was coerced. However, the surrounding circumstances show that defendant made his statement while the officers were performing routine prison intake duties. They were unaware of the threat until defendant brought it to their attention. He had been committed to San Quentin for other crimes before being charged with these murders. His request for secure

22

placement in Folsom because "they" were going to stab him certainly called for further inquiry. There was no indication the threat was related to pending charges, as opposed to the crimes for which he was already in custody, or indeed for grudges developed during his incarceration. The officers' questions sought to discover the source of the threat, not defendant's guilt of any particular offense. He was under no compulsion to admit the murders in order to attain a secure prison placement. Defendant falls far short of showing that his admission was the product of coercion flowing from promises or threats by agents of the state, as in the cases he cites. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 288; *Lam v. Kelchner* (3d Cir. 2002) 304 F.3d 256, 265; *U.S. v. McCullah* (10th Cir. 1996) 76 F.3d 1087, 1100.)

Next, defendant claims his statement was inadmissible under *Miranda*, *supra*, 384 U.S. 436. He relies, as he did below, on *People v. Morris* (1987) 192 Cal.App.3d 380 (*Morris*). Morris had been arrested for murder, booked, and placed in a holding cell. The booking officer remembered that he had forgotten to give Morris an identification bracelet, and took him from the cell. Morris, who was nervous and tearful when booked, had calmed down. The officer asked him " 'if we should anticipate any type of problem with his being there in jail.' " (*Id.* at p. 388.) Morris said he didn't think so. The officer then asked, " ' "Who are you accused of killing?" ' " (*Ibid.*) Morris " 'cried a little bit and then he stated, "My brother, Randy Morris, was in last October for it." And "I never did anything like this before — I killed my sister-in-law." ' " (*Ibid.*) The officer testified that he had questioned Morris solely for the purpose of jail security, thinking there might be a problem with the victim having relatives or friends who might retaliate against Morris. This was a normal procedure when someone was jailed for a serious offense. (*Ibid.*)

23

The *Morris* court held that the admission was inadmissible at trial under *Miranda*, *supra*, 384 U.S. 436, and *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*). (*Morris*, *supra*, 192 Cal.App.3d at pp. 389-390.) In *Innis*, the high court stated: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . [T]he *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. . . . [S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Innis*, *supra*, 446 U.S. at pp. 301-302, fns. omitted.)

The *Morris* court did not explain why, in light of the officer's testimony that the questions he asked were a normal booking procedure for those jailed on serious charges, the *Innis* exception for questioning "normally attendant to arrest and custody" did not apply. (*Innis*, *supra*, 446 U.S. at p. 301.) Nor did the court explain its rejection of the notion that "simply phrasing a question addressed to a criminal suspect in terms of 'accusation' removes the question from the realm of those which the police should reasonably expect to produce an incriminating response." (*Morris*, *supra*, 192 Cal.App.3d at p. 389.) It concluded that while the police may ask whatever questions are required for jail security, if the inquiries are reasonably likely to yield an incriminating response, the suspect's responses are not admissible at trial unless they were preceded by *Miranda* warnings. (*Morris*, at pp. 389-390.)

24

Since *Morris* was decided, the "booking exception" mentioned in *Innis* has become well established.  In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*), the plurality opinion recognized a " 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' " (*Muniz,* at p. 601 (plur. opn. of Brennan, J.).)  Quoting an amicus curiae brief, the plurality noted: " 'recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' " (*Muniz,* at p. 602, fn. 14.)

A concurring and dissenting opinion in *Muniz*, joined by four justices, presumed the validity of the " 'booking exception.' " (*Muniz, supra*, 496 U.S. at p. 607 (conc. & dis. opn. of Rehnquist, C.J.).)  The exception is now settled.  (See *People v. Gomez* (2011) 192 Cal.App.4th 609, 630; *U.S. v. Brown* (8th Cir. 1996) 101 F.3d 1272, 1274; *Presley v. City of Benbrook* (5th Cir.1993) 4 F.3d 405, 408, fn. 2.)  The *Gomez* court summarized the governing considerations as follows:  "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.  [Citation.]  Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was

25

suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*Gomez*, at pp. 630-631.)

Here, defendant's intake interview at Folsom Prison was closely analogous to the process of being booked into jail. Whether it was White or Reed who asked defendant either "why are they going to stab you?" (as White remembered), or "what his crime was" (as Reed recalled), neither question was designed to elicit an incriminating response. The officers were appropriately responding to defendant's own security concern, and would not reasonably have expected him to produce a confession.[14] It was plain from White's testimony that he was seeking only to determine the nature of the danger facing defendant, in order to minimize it. According to Reed, he had defendant's commitment offense in mind when he questioned defendant, rather than crimes for which defendant might be under investigation. The report on defendant's statement was not passed along to the police until Ingersoll inquired about it. The questioning was part of a routine, noninvestigative prison process, well within the scope of the booking exception

---

[14] At oral argument, defendant contended the questioning by White and Reed went beyond their normal intake duties. The record does not support this claim. While Reed acknowledged that a more thorough investigation would follow the initial decision to place an inmate in segregated housing, he also testified that he would explore inmates' reasons for safety concerns at the intake interview. Indeed, defense counsel conceded at the suppression hearing that White and Reed were "totally within their function" when they pressed defendant about the reason for his apprehension, and could not be expected to simply take an inmate's word on the need for segregated housing. Counsel argued that the questioning was proper, but nevertheless inadmissible under *Morris*, *supra*, 192 Cal.App.3d at pages 389-390.

26

recognized in *Innis* and *Muniz*. Accordingly, defendant's *Miranda* arguments are without merit.**15**

Defendant also claims the questioning by Lieutenant Reed and Officer White violated his right to counsel under *Massiah*, *supra*, 377 U.S. 201. The claim fails. We have stated *Massiah*'s holding as follows: "[W]hen, after adversarial judicial criminal proceedings have been initiated and in the unwaived absence of counsel, a government agent deliberately elicits from a defendant incriminating statements, those statements are inadmissible at a trial on the charges to which the statements pertain. [Citations.] Such a Sixth Amendment violation occurs when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck. [Citations.]" (*People v. Dement* (2011) 53 Cal.4th 1, 33; see also *People v. Huggins* (2006) 38 Cal.4th 175, 244-245.)

Here, as discussed above, defendant fails to show any deliberate elicitation by the officers. During a routine prison intake interview, defendant voluntarily reported threats to his safety. The questioning that followed was pertinent to that subject, and fell far short of the intentional exploitation required for a *Massiah* violation.

2. *The Questioning of Ross*

Before the prosecutor questioned witness David Ross about defendant's role in the robbery and shootings, he asked Ross about the plea agreement under which Ross would receive a 20-year prison term, rather than the death penalty, if

---

**15** We disapprove *People v. Morris*, *supra*, 192 Cal.App.3d 380, to the extent it is inconsistent with our conclusion.

he testified truthfully.  Defendant contends this questioning was improperly leading and argumentative, and amounted to vouching for the witness.[16]

The prosecutor questioned Ross as follows:

"Q.  What are you required to do when you testify?

"A.  Tell the truth.

"Q.  You're charged right now with murder, aren't you?

"A.  Yes, sir.

"Q.  Of two women?

"A.  Yes, sir.

"Q.  Burglary?

"A.  Yes.

"Q.  Robberies?

"A.  Yes, sir.

"Q.  Enhancements?

"A.  Yes, sir.

"Q.  You recognize what your potential penalty for those crimes could be?

"A.  Yes, sir.

"Q.  Tell that to the jury.

"A.  The death penalty.

"Q.  Now, if you tell the truth here, Mr. Ross, you expect to get a benefit, don't you?

"A.  Yes, sir.

"Q.  And what is that benefit?

"A.  Not to get the death penalty.

---

[16]  He asserts violation of his rights under the Sixth and Fourteenth Amendments, and unspecified "state constitutional corollaries."

"Q. And if you tell the truth here, Mr. Ross, how much actual time will you spend in jail or prison before you're released?

"A. Twenty years.

"Q. Twenty actual years in prison?

"A. Yes. Yes, sir.

"Q. Mr. Ross, what happens to you if you minimize your involvement in these crimes?

"A. I get my deal taken away from me.

"Q. What happens to you, Mr. Ross, if you maximize anybody else's involvement in these crimes?

"A. Well, it's taken away from me, my deal.

"Q. You understand that there is one thing and one thing only you are required to do in order to get the benefit of this agreement and spend 20 actual years in prison?

"[Defense counsel]: Objection. It's leading and argumentative.

"The Court: Well, it's somewhat leading but for this purpose, overruled.

"[Prosecutor]: It's foundational. Thank you.

"By [the prosecutor:]

"Q. Answer the question. What one thing are you required to do in order to get the benefit of your agreement?

"A. To tell the truth.

"Q. If telling the truth makes you look bad, do you still get the benefit of your agreement?

"A. Yes, sir.

"Q. If telling the truth shows that you injured either or both of those women, do you still get the benefit of your agreement?

"A. Yes, sir.

"Q. If telling the truth shows that you murdered one or both of those women, do you still get the benefit of your agreement?

"A. Yes, sir.

"Q. And what happens if you lie and falsely cast blame on anybody else?

"A. My deal gets taken away.

"Q. You understand that quite clearly?

"A. Yes, sir."

Defendant claims the trial court should not have permitted such leading questions. "A question is 'leading' if it 'suggests to the witness the answer the examining party requires.' (Evid. Code, § 764; see also 3 Witkin, Cal. Evidence (3d ed. 1986) § 1820, p. 1779 et seq.; 1 McCormick on Evidence (4th ed. 1992) § 6, p. 17; 3 Wigmore, Evidence (Chadbourn ed. 1970) § 769, p. 154.)" (*People v. Williams* (1997) 16 Cal.4th 635, 672.)[17] "Evidence Code section 767, subdivision (a)(1), provides that leading questions 'may not be asked of a witness on direct or

---

[17]    We note that only a few of the questions asked of Ross were unequivocally leading. "It is a common misconception that all questions asking for a 'yes' or 'no' answer are leading. [Citation.] In fact only questions that contain a direction to the witness are so. Perhaps the easiest example is a question that begins, 'Isn't it true that . . . ?' Some questions that begin 'Did X do [a detailed set of facts]?' may be covered. The California Supreme Court has referred to this explanation of leading questions by McCormick: 'A question may be leading because of its form, but often the mere form of a question does not indicate whether it is leading. The question which contains a phrase like 'did he not?' is obviously and invariably leading, but almost any other type of question may be leading or not, dependent upon the content and context . . . . The whole issue is whether an ordinary man would get the impression that the questioner desired one answer rather than another. The form of a question, or previous questioning, may indicate the desire, but the most important circumstance for consideration is the extent of the particularity of the question itself.' (1 McCormick on Evidence (4th ed. [1992]) § 6, pp. 17-18, cited with approval in [*People v. Williams*, *supra*, 16 Cal.4th at p. 672].)" (Simons, Cal. Evidence Manual (2012 ed.) § 3:27, p. 250.)

redirect examination' except in 'special circumstances where the interests of justice otherwise require.' Trial courts have broad discretion to decide when such special circumstances are present. (See *Estate of Siemers* (1927) 202 Cal. 424, 437; *People v. Garbutt* (1925) 197 Cal. 200, 207.)" (*Williams*, at p. 672.) "Leading questions may be asked on direct examination if there is little danger of improper suggestion and where such questions are necessary to obtain relevant evidence. Examples include preliminary matters . . . ." (Simons, Cal. Evidence Manual, *supra*, § 3:27, p. 250.) Here, it was well within the court's discretion to allow the prosecutor some latitude in questioning Ross about the preliminary matter of his plea agreement. (*Ibid*.; see also 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 181, p. 279.)

Nor were the prosecutor's questions argumentative. "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable." (*People v. Chatman* (2006) 38 Cal.4th 344, 384; see Simons, Cal. Evidence Manual, *supra*, § 3:30, p. 252.) Here, the prosecutor was not being argumentative. His witness had been promised a relatively lenient sentence for his involvement in these serious offenses. Ross's credibility was squarely at issue, and the terms of the plea agreement and his understanding of what it required were highly relevant to that critical point. (*People v. Bonilla* (2007) 41 Cal.4th 313, 337 (*Bonilla*), and cases therein cited.) It was entirely proper for the prosecutor to advise the jury of the terms of the agreement.

Defendant's claim of vouching was forfeited by his failure to object. (*Bonilla*, *supra*, 41 Cal.4th at p. 336.) His objection that the questioning was "leading and argumentative" did not extend to the matter of vouching. Contrary to defendant's assertion, the fact that the court overruled his objection provided no

31

reason to believe that a properly stated and founded vouching objection would have been futile.

In any event, the vouching claim fails on the merits. The prosecutor did not place the prestige of the government behind Ross through personal assurances of veracity, or suggest that information not presented to the jury supported his testimony. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1167; *People v. Fierro* (1991) 1 Cal.4th 173, 211.) It is settled that making a record of the terms of a plea agreement requiring a witness to tell the truth does not constitute impermissible vouching. (*People v. Frye* (1998) 18 Cal.4th 894, 971-972; see also *Bonilla*, *supra*, 41 Cal.4th at pp. 336-337.) Here, as in *Bonilla*, "The jury *might* believe the prosecutor thought [the witness] was being truthful, but there is no reason to think it would have concluded the prosecutor had special information *outside the record* on which to base that belief, nor is there any reason to think this inference would have led the jury to conclude it no longer needed to evaluate [the witness's] credibility for itself." (*Id.* at p. 337, fn. 9.)

C. *Penalty Phase Issues*

1. *The Grant of Defendant's* Faretta *Motion*

Defendant claims the court erred by allowing him to represent himself at the penalty phase.[18] He acknowledges that his motion under *Faretta v. California* (1975) 422 U.S. 806 was belated, and therefore it was within the court's discretion to grant or deny it. However, defendant contends the court failed to exercise that discretion or to inquire into the "specific factors underlying the request," as

---

[18] Defendant claims violation of his rights to due process under the Fourteenth Amendment, and to a fair and reliable penalty trial under the Sixth, Eighth, and Fourteenth Amendments.

32

required by *People v. Windham* (1977) 19 Cal.3d 121, 128. We have held that any such error is invited.

Under the federal constitution, a mentally competent defendant has the right of self-representation. (*Indiana v. Edwards* (2008) 554 U.S. 164, 177-178; *People v. Johnson* (2012) 53 Cal.4th 519, 530-531.) That right, however, must be asserted within a reasonable time before trial. "When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion. [Citations.]" (*People v. Bradford* (1997) 15 Cal. 4th 1229, 1365.) "Among [the] factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People v. Windham*, *supra*, 19 Cal.3d at p. 128.)

The inquiry contemplated by *Windham* is intended to "ensur[e] a meaningful record in the event that appellate review is later required." (*People v. Windham*, *supra*, 19 Cal.3d at p. 128.) Here, appellate review is not required. (See *id*. at p. 129, fn. 6, contemplating a record sufficient to "evaluate alleged abuses of discretion *when motions for self-representation are denied*." (Italics added.)) As we held in *People v. Clark* (1992) 3 Cal.4th 41: "[D]efendant may not be heard to argue on appeal that his own motion should not have been granted. [¶] Defendant is correct that the court has discretion to deny a midtrial motion for self-representation. (*People v. Windham*, *supra*, 19 Cal.3d 121. . . .) However, '[t]he *Windham* factors primarily facilitate efficient administration of justice, not protection of defendant's rights.' (*People v. Hill* (1983) 148 Cal.App.3d 744, 760.) Because the court granted defendant's motion for self-representation at his

33

own insistence, he may not now complain of any error in the court's failure to weigh the *Windham* factors. (*People v. Brownlee* (1977) 74 Cal.App.3d 921, 934; see also *People v. Bloom* [(1989)] 48 Cal.3d [1194,] 1219-1220.)" (*Clark*, at p. 109.)

In any event, defendant's claims are meritless. At the court's direction, the prosecutor questioned defendant at length about his request for self-representation and his understanding of the consequences. Asked about his reasons, defendant said: "It's just a belief. I've had it from day one. I've always wanted to represent myself. That's basically it. It's simple. You know, I'm happy with my lawyers but it's a belief that I had. And I told them from day one that if it comes to a penalty phase time, I would like to represent myself. That's basically it."

No more was required. The court exercised its discretion to grant defendant the self-representation he sought, and he is in no position to assert error.

### 2. *The Victim Impact Testimony*

At the outset of the penalty phase, the prosecutor disclosed that he might "call one or two family members . . . on the matter of victim impact." Defendant objected and asked for more specificity. The prosecutor said there would be no more than two family members, and identified Lili Williams and Sergio Corrieo as possible witnesses. Defendant asked for an offer of proof as to "what areas they're going to be testifying in." The prosecutor responded that defendant was not entitled to that information, and that he himself did not know exactly what the witnesses might say. The court advised defendant to be "on your toes" and object if the testimony strayed into improper areas. It told him he could simply raise his hand if he became concerned, and the court would stop the proceedings to allow him to consult with advisory counsel. Defendant said he understood, and thanked the court.

34

Only Sergio Corrieo testified as to the impact of the murders on his family. At the end of his testimony, the prosecutor mentioned that Sergio had testified at the guilt phase about his feelings regarding defendant when he encountered him at Folsom Prison. The prosecutor asked Sergio if his feelings remained the same. He replied, "Absolutely."[19] The prosecutor asked no further questions, and defendant declined to cross-examine.

Defendant subsequently moved to strike Sergio's testimony "as being outside the scope of the permissible victim's impact," and specifically objected to his testimony "as to the punishment that should be imposed." The prosecutor argued that Sergio's testimony was appropriate, and that he had offered no opinion on penalty. The court observed, "Except inferentially that you asked him whether his viewpoints are still the same." The prosecutor said his question was asked "solely for the purpose of [showing] motive and bias." The court ruled that Sergio's testimony was within the scope of appropriate victim impact evidence.

Defendant raises two claims with respect to this evidence. First, he claims the court erred by failing to grant his request for an offer of proof as to the substance of the victim impact testimony.[20] However, we have held that

---

[19]    Sergio's guilt phase testimony on his feelings about defendant was limited to two areas. First, he said he was "very agitated" when he saw defendant getting off the bus from San Quentin, which led him to ask to be relieved from his duties in the receiving area. Second, while he was waiting in a separate room, a co-worker told him that defendant was in a holding cell next door, which prompted Sergio to call out to defendant through a space at the bottom of a door, ask him if he remembered Maria Elena Corrieo, and tell him, "You're a dead man, mother fucker."

[20]    Defendant relies on his due process right to adequate notice and a fair trial under the Fourteenth Amendment and article I, sections 7 and 15 of the California Constitution, and on his Eighth Amendment right to a fair and reliable penalty determination.

disclosure of the identity of victim impact witnesses is sufficient, and that defendants are "not entitled to a summation of the witnesses' expected testimony." (*People v. Benavides* (2005) 35 Cal.4th 69, 107; cf. *People v. Scott* (1997) 15 Cal.4th 1188, 1219; *People v. Roberts* (1992) 2 Cal.4th 271, 330.)  Defendant's references to procedures followed in other jurisdictions are not persuasive.

Second, defendant contends the trial court should have granted his motion to strike Sergio's testimony.[21]  He asserts that the prosecutor's elicitation of a reaffirmation of Sergio's feelings when he saw defendant at Folsom Prison was improper under *Payne v. Tennessee* (1991) 501 U.S. 808.  "[T]he United States Supreme Court has made clear that 'admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment.'  (*Payne*, *supra*, 501 U.S. at p. 830, fn. 2 [leaving intact the portion of *Booth v. Maryland* (1987) 482 U.S. 496 requiring exclusion of such evidence].)"  (*People v. Taylor* (2010) 48 Cal.4th 574, 646-647.) Here, Sergio's testimony did not reflect his view of the appropriate sentence, but it did reflect animosity toward defendant.  However, there is no reasonable possibility that defendant was prejudiced by this brief and general reference.  The jury had already, and properly, heard Sergio's account of the episode at Folsom Prison during the guilt phase.  The prosecutor did not walk Sergio through his prior testimony, but merely asked if his feelings had changed.

---

[21]     Defendant contends the admission of Sergio's opinion testimony violated the Eighth Amendment, his federal and state rights to trial by jury (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16), the relevance requirement of Evidence Code section 350, and his right to a fair trial (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7 & 15.)

### 3. *The Denial of a Limiting Instruction*

Defendant contends the trial court prejudicially erred in refusing a proposed special instruction on victim impact evidence.[22] He focuses on two elements of his proposed instruction.

First, he claims the court should have told the jury: "Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance." This instruction was properly refused because it incorrectly stated the law. "[A] jury at the penalty phase of a capital case may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family . . . ." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195.) Defendant argues that this statement in *Pollock* was not a holding. However, we have made it plain that victim impact evidence is admissible as an aggravating factor. (*People v. Robinson* (2005) 37 Cal.4th 592, 650, citing cases.) There is no merit in defendant's assertion that such evidence cannot be aggravating because it is common to all murders. " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' [Citation.]" (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 825.)

Second, defendant challenges the court's refusal to instruct the jury that it could not consider victim impact evidence unrelated to personal characteristics of the victim that were known to defendant at the time of the crime. We have

---

[22]    He relies on the Eighth Amendment.

repeatedly rejected this argument. (*People v. Nelson* (2011) 51 Cal.4th 198, 219, fn. 17, citing cases.) We have also held that the standard instructions given here, including CALJIC No. 8.85, adequately convey to the jury the proper consideration and use of victim impact evidence. (See, e.g., *People v. Tate*, *supra*, 49 Cal.4th at p. 708.)

### 4. *The Family Impact Instruction*

The court instructed the jury in part: "Sympathy for the family of the defendant is not a matter you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character." (CALJIC No. 8.85.)

Defendant contends this aspect of the standard instruction violated California's death penalty statute and his rights under the Eighth Amendment. Established precedent is to the contrary. "The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation. (*People v. Smith* (2005) 35 Cal.4th 334, 366–367; *People v. Smithey* (1999) 20 Cal.4th 936, 1000; *People v. Ochoa* (1998) 19 Cal.4th 353, 454-456 (*Ochoa*).)" (*People v. Bennett* (2009) 45 Cal.4th 577, 601.) "[N]othing in the federal Constitution requires a different result (*Ochoa*, at p. 456) and defendant identifies no reason to reconsider our conclusion." (*Bennett*, at p. 602.) Defendant's reference to family considerations in probation determinations is not on point. "Unlike [the probation statutes], section 190.3 identifies examples of matters relevant to aggravation, mitigation, and sentence including, but not limited to, the 'circumstances of the present offense, any prior felony conviction . . . , and the defendant's character, background, history, mental condition and physical condition.' We concluded that, '[*i*]*n this context*, what is ultimately relevant is a defendant's background and

38

character — not the distress of his or her family.' (*Ochoa*, . . . at p. 456, italics added [in *Bennett*].)" (*Bennett*, at p. 602.)

We note, in any event, that defendant was in no position to seek sympathy based on the effect his execution might have on his family. He adamantly declined to present any evidence at all in the penalty phase. Although in closing argument he expressed regret over the impact his execution might have on his daughter, the jury was given no evidence to consider on that point.

### 5. *The Instructions on Aggravating Factors*

Contrary to defendant's arguments, nothing in the federal Constitution requires the penalty phase jury to agree unanimously that a particular aggravating circumstance exists, or to find all aggravating factors beyond a reasonable doubt or by a preponderance of the evidence. (*People v. Thomas* (2011) 52 Cal.4th 336, 365; *People v. Burney* (2009) 47 Cal.4th 203, 267-268; *People v. Williams* (2008) 43 Cal.4th 584, 648-649.) This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296. (*People v. Thomas*, *supra*, 52 Cal.4th at p. 365; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308; *People v. Carrington* (2009) 47 Cal.4th 145, 200.)

### 6. *The Prosecutor's Argument on Mitigation*

Defendant claims the prosecutor's arguments on two mitigating factors were so misleading as to deny him his right to meaningful jury deliberation on mitigation.[23] First, he complains the prosecutor misrepresented the concept of

---

[23] Defendant claims his rights under the Sixth, Eighth, and Fourteenth Amendments were violated, as well as unspecified "corollaries" under the state Constitution.

"extreme mental or emotional disturbance" under section 190.3, factor (d). Defendant refers to the following comments by the prosecutor:

"What that brings to mind is someone who kills for religious purposes, for mistaken moral purposes as a result of mental disease; those who, because of brain defects or the like, aren't able to understand the consequences of their acts. Yet, what we see is that the defendant suffers from none of this. He suffers from no extreme mental or emotional disturbance. He suffers from no mental illness or no organic brain disease. He knew what he was doing when he committed the murders. He knew what he was doing and why he wanted it; in short, for greed and to kill women to leave no surviving witnesses.

"So unlike those who believe that they are commanded by God mistakenly to kill or to maim people, the defendant did this for the most venal of reasons, and, as a consequence, this factor in mitigation, although it might apply to some criminal defendants, does not apply to Corey Williams."

Defendant also claims the prosecutor misrepresented the "age of the defendant" factor. (§ 190.3, factor (i).) The prosecutor argued: "A factor to be considered by you is the age of the defendant. . . . What this means to me is there could be an individual who, having lived for 30 or 40 or 50 or 60 years, a law-abiding life, then commits two murders and you might take into account that law-abiding pattern over those period of years and consider that age in that capacity. What this really means to my mind is: Does the defendant know the difference between right and wrong? Does he know the harm he causes? And all evidence in this case suggests that he does. He knows the pain that he inflicts, and he did everything in his power to avoid those consequences: ski masks, murdering witnesses, fleeing the scene, hiding the money. He knows all those things, ladies and gentlemen. And so for those who might not be able to — this might be a factor in mitigation, but in Corey Leigh Williams's case, it simply does not apply."

40

Defendant contends these arguments prejudiced him by preventing the jury from considering his mental disturbance and age as mitigating factors. The Attorney General correctly notes that defendant has forfeited these claims by failing to object below. (*People v. Bemore* (2000) 22 Cal.4th 809, 853-854.) In any event, they lack merit. No evidence of extreme mental or emotional disturbance was presented at either phase of trial. Defendant claims mental disturbance could be inferred from his behavior and his childhood experience of being raised by a drug-addicted prostitute. Such an inference would have been entirely speculative, and defendant did not urge it at trial. Nor did the prosecutor tell the jury it was barred from considering mental disturbance as a mitigating factor. To the contrary, he said it *was* a factor in mitigation, but did not apply on the facts of this case. There was nothing improper about that assertion.

As for defendant's age, the prosecutor's argument was rather confused. First, he suggested that an older, previously law-abiding defendant might assert age as a mitigating factor, then he said that the crux of the factor was whether a defendant knew the difference between right and wrong. The older defendant posited by the prosecutor would presumably not be in a position to claim ignorance of the difference between right and wrong. However, confusion is not misconduct, nor did the prosecutor say that the jury could not consider defendant's age in mitigation. Indeed, he said the jury *should* consider age, but that it was not a relevant factor here.

The court properly instructed the jury that it must consider "the age of the defendant at the time of the crime" as a sentencing factor, "if applicable."[24] We

---

[24]     The court also told the jury: "You must accept and follow the law as I state it to you . . . . If anything concerning the law said by the attorney or the defendant

*(footnote continued on next page)*

have long held that "age" as statutory sentencing factor includes "any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People v. Lucky* (1988) 45 Cal.3d 259, 302; see also, e.g., *People v. Carrington*, *supra*, 47 Cal.4th at p. 202.) Defendant did not argue below that the jury should consider that he was 19 at the time of the crimes. Nevertheless, the jury was free to disregard the prosecutor's less than coherent argument on this factor and view his relative youth as a mitigating factor.

Defendant made his own strategic decisions at the penalty phase. He chose not to present mitigating evidence. He told the court he was calling no witnesses. The court advised him that his attorneys had prepared documents they wanted to introduce at the penalty phase, and which they had brought to court. Defendant said he had looked at these documents, but did not want to present them. The court urged him to reconsider, and gave him time to reflect on his decision. At a subsequent hearing, defendant confirmed that he had seen all the mitigating evidence turned over to the defense by the prosecutor, as well as material prepared by his counsel that pertained to his family history and background. These exhibits were displayed on the wall when defendant told the court that he had given "very careful thought" to his decision not to present them.

Nor did defendant argue any mitigating circumstance, telling the jury, "I'm not going to stand up here and cry or ask you for any sympathy." He added, "You

_____

*(footnote continued from previous page)*

during their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions."

42

will notice that I did not put on a defense to show mitigating circumstances of people testifying on my behalf. That's because I don't blame my lifestyle on other people. My actions are my actions and mine alone. I chose the life I lead. . . ." Defendant was given ample opportunity to invite the jury's consideration of mitigating evidence. Nothing in the prosecutor's arguments detracted from that opportunity or kept the jury from considering all the evidence.

### 7. *Cumulative Error*

Defendant argues that the cumulative effect of the errors he has asserted require reversal. We have found no error that, either alone or in conjunction with others, prejudiced defendant.

### 8. *The Constitutionality of the Death Penalty Law*

Defendant raises a series of constitutional challenges to the death penalty law, which he acknowledges we have previously considered and rejected. We do so again here.

The capital sentencing scheme does not violate the Eighth Amendment by failing to distinguish defendants sentenced to death from other defendants. (*People v. Thomas, supra,* 51 Cal.4th at p. 506; *People v. Schmeck* (2005) 37 Cal.4th 240, 304 (*Schmeck*.)) Section 190.3, factor (a), establishing the circumstances of the crime as a sentencing factor, does not result in arbitrary and capricious capital sentences. (*Thomas,* at p. 506; *Schmeck*, at p. 304.) The absence of instructions on the need for a unanimous determination of aggravating facts, or as to the burden of proof for determining whether aggravating factors outweigh mitigating factors, does not violate the Sixth, Eighth, or Fourteenth Amendments to the federal Constitution. (*Thomas,* at p. 506; *Schmeck*, at p. 304.) CALJIC No. 8.85 does not violate the Sixth, Eighth, or Fourteenth Amendments by including vague factors, by failing to delete inapplicable factors or differentiate between aggravating and mitigating factors, by using the adjectives "extreme" and

43

"substantial," or by omitting a burden of proof as to either mitigation or aggravation. (*Souza*, *supra*, 54 Cal.4th at p. 140; *Schmeck*, at p. 305.)

The death penalty scheme does not violate international law, including The International Covenant on Civil and Political Rights. (*Souza*, *supra*, 54 Cal.4th at p. 142; *Schmeck*, *supra*, 37 Cal.4th at p. 305.) Introducing the facts underlying a prior conviction at the penalty phase does not violate the double jeopardy clauses of the federal or state Constitutions. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1072; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 134-135.) Allowing a jury that has convicted the defendant of first degree murder to decide if he has committed other criminal activity does not violate the right to an unbiased decisionmaker under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 77; *People v. Medina* (1990) 51 Cal.3d 870, 907.) Written findings on aggravating circumstances are not required by federal due process considerations or the Eighth Amendment. (*Souza*, at p. 142; *People v. Thomas, supra,* 51 Cal.4th at p. 506.)

Finally, without supporting authority, defendant asserts that the state's likely failure to provide him with habeas corpus counsel in a timely manner violates his right to counsel, confrontation, and to appear and defend under the Sixth Amendment. He contends this situation constitutes cruel and unusual punishment under the Eighth Amendment, and a violation of due process under the Fourteenth Amendment. These claims are entirely speculative. We reject them.

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

45

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** P. v. Williams
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S093756
**Date Filed:** February 7, 2013
_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Richard E. Arnason

_____

**Counsel:**

Jeanne Keevan-Lynch, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Alice Lustre and Ann P. Wathen, Deputy Attorney General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeanne Keevan-Lynch
P.O. Box 2433
Mendocino, CA  95460
(707) 895-2090

Ann P. Wathen
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5972