Filed 11/14/13  P. v. Greene CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244147 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078978) |
| v. | |
| FLOYD GREY GREENE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Brandlin, Judge.  Affirmed as modified with directions.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

At an initial trial, a jury convicted defendant, Floyd Grey Greene, of: pimping (Pen. Code, § 266h, subd. (a));[1] pimping a minor (§ 266h, subd. (b)(2)); and procuring a child under 16 for lewd or lascivious acts (§ 266j). At the first trial, the jury was unable to reach a verdict on a murder charge. Following retrial, a second jury convicted defendant of first degree murder. Defendant was sentenced to two consecutive 25-year-to-life terms plus a determinate term of 9 years, 4 months. We modify defendant's presentence credits. We affirm the judgment in all other respects.

# II. THE EVIDENCE

## A. The Prosecution Case

### 1. Events Preceding The Murder

Evelyn Smith met defendant, a 22-year old pimp, in December 2006. When Ms. Smith met defendant, she was employed, attending college, and owned a car debt free. She lived in Hawthorne with a close friend of several years, Kendra Grimes. Their apartment was on Oxford Avenue near 118th Street. After meeting defendant, Ms. Smith stopped going to school, quit her job and became distant from Ms. Grimes. Ms. Smith became inseparable from defendant. She gave him a key to the apartment she shared with Ms. Grimes. She began to aid him financially. Early in their relationship, after they became sexually intimate, defendant told Ms. Smith, "[P]ay me, or pay me no attention." Ms. Smith gave defendant $1,200. At trial, defendant explained: "Well . . . she would call my phone, asked me why I ain't called her back, what's wrong, what's the matter.

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

[¶] And I basically let her know pay me, or pay me no attention. I mean, what is this? Where are we going with this? Was just a sexual encounter." In addition to giving defendant money, Ms. Smith purchased a car for him, a midnight blue Chevrolet Monte Carlo. When defendant failed to make the payments on the Monte Carlo, Ms. Smith traded in her own car to cover the loan. As the relationship continued, and Ms. Smith's financial resources dwindled, defendant encouraged her to become a prostitute.

In January 2007, Ms. Smith began to work as a prostitute. From January to May 2007, Ms. Smith entertained four to five customers each night and earned approximately $100. She gave all the money she earned to defendant. Defendant paid Ms. Smith's rent and provided her with necessities. When asked why she took up prostitution, Ms. Smith testified: "I just feel like I was just at a low point in my life, and I feel like [defendant] took advantage of me. And used that to his advantage."

In April 2007, Ms. Smith was arrested for prostitution. Defendant woke Ms. Smith's roommate, Ms. Grimes, in the middle of the night. Defendant asked Ms. Grimes to post Ms. Smith's bail. Defendant provided the bail money. Ms. Grimes executed the necessary paperwork in her name. This was when Ms. Grimes first learned that Ms. Smith was engaged in prostitution.

In May 2007, Ms. Smith met Marco Smith at a gym. They exchanged phone numbers. Later, they met at a park. On a second occasion, they went to a restaurant in Ladera Heights. This was the first time Ms. Smith had dated anyone since meeting defendant. She did not want Marco[2] to know she was a prostitute.

---

[2] To avoid confusion, because the Smiths have the same surname, we refer to Mr. Smith by his first name.

## 2. The Murder

Ms. Smith had a third date with Marco on May 5, 2007. Defendant had arrived at Ms. Smith's apartment earlier that evening with a friend. Ms. Smith told defendant she had a date. She did not say it was a non-prostitution date. Ms. Smith left the apartment when Marco telephoned and said he was parked outside her building. Defendant was still in the apartment at that time. Ms. Smith returned to her apartment with Marco sometime around or after midnight. Not long after arriving home, Ms. Smith asked Marco to take her to the store. Because he did not want to go out, Marco gave Ms. Smith the key to his Honda. Ms. Smith stopped first at a payphone. On May 6, 2007, between 1:07 a.m. and 1:09 a.m., Ms. Smith called defendant's cellular telephone number four times. Ms. Smith did so she said because she was required to check in with defendant nightly. Ms. Smith testified defendant did not answer; she left him a message saying she was at home. She then drove to a liquor store where, as shown by surveillance videotape, she purchased a soda at 1:13 a.m.

Ms. Smith parked Marco's Honda on 118th Street and walked back to her apartment on Oxford Avenue. Once inside her apartment, Ms. Smith discovered she did not have Marco's car key. After securing a flashlight, Ms. Smith and Marco returned to the car. Marco carried the flashlight. They looked into the car on the passenger side. As they walked to the driver's side of the vehicle, defendant stepped forward. He was wearing a "hoodie" that covered his head. Defendant said something Ms. Smith did not understand. Then defendant shot Marco at least twice. Ms. Smith ran. She used a borrowed cellular telephone to call an emergency operator. Ms. Smith made the emergency call at 1:31 a.m. and related her friend had been shot.

Around midnight that evening, John Garcia was in his Hawthorne apartment on 118th Street near Oxford Avenue. Ms. Smith's building was nearby, on Oxford Avenue north of 118th Street. Mr. Garcia was on his balcony smoking a cigarette. He saw a young, slender, well dressed and groomed African-American man standing on the sidewalk. The man was standing beneath a light. He was wearing a large, very shiny

wristwatch. The man looked repeatedly towards the corner of Oxford Avenue. Ten to fifteen minutes later, the man walked to the corner of Oxford Avenue and 118th Street. He stood there no more than five minutes, then returned to his original position. The man continued to look down the street toward Oxford Avenue. Eventually, the man walked east on 118th Street toward York Avenue. He crossed the street and got into a vehicle parked on 118th Street. It was a very dark blue or black shiny, clean car. It was parked 150 yards away even though there were no cars parked on 118th Street in front of Mr. Garcia's apartment building. The man drove west on 118th Street and turned right on York Avenue. Five to eight minutes later, the man returned. He parked his car in the same spot and returned to stand under the light. The man resumed looking down the street, primarily toward Oxford Avenue. After Mr. Garcia reentered his apartment, he heard three bangs. He ran outside. Mr. Garcia thought he saw someone lying near a car but he was not sure. The dark blue or black car he had earlier observed was gone. Mr. Garcia had seen the African-American man's face numerous times. Mr. Garcia's view of the man was unobstructed. At trial, however, Mr. Garcia was unsure the man who got into the car and drove away the night Marco was shot was the man in the courtroom. He testified: "It's been a long time. And there was a distance. And my mind is - - not what it used to be. I'm 74 years old."

Sergeant Stephen Colquette responded to a "shooting victim" radio call around 1:30 a.m. When Sergeant Colquette arrived, Marco was lying in the street. Marco was lying next to his car. He was unresponsive. Paramedics declared Marco dead at 2:02 a.m. Marco had suffered two fatal gunshot wounds.

Sergeant Richard Biddle arrived on the homicide scene at 4:20 a.m. Sergeant Biddle observed an illuminated flashlight in the street near Marco's body. A Honda key was on the front passenger seat of Marco's vehicle. The Honda was locked.

Sergeant Biddle interviewed Ms. Grimes at 5:30 a.m. Ms. Grimes said that on May 5, 2007, she had returned home from work around 4:30 p.m. Ms. Smith was in the apartment at that time. Ms. Grimes left the apartment sometime later, returning around 9 p.m. Ms. Smith was at home when Ms. Grimes returned. At some point, Ms. Grimes

5

saw defendant in the apartment. Defendant was accompanied by a man Ms. Grimes had not seen before that night. According to Ms. Grimes, defendant and the unidentified man went into Ms. Smith's room. Prior to 11 p.m., Ms. Smith, defendant, and the other man left the apartment. Ms. Grimes went out again. Ms. Grimes told Sergeant Biddle she returned home at about 1:15 a.m. and went straight to her bedroom. She heard the apartment door open. Ms. Grimes assumed Ms. Smith had returned for the night. Ms. Grimes heard the television in Ms. Smith's bedroom. Sometime later, Ms. Grimes heard Ms. Smith leave the apartment. The next thing Ms. Grimes' knew, Sergeant Biddle was knocking on her door.

Sergeant Biddle interviewed Ms. Smith at 8:05 a.m. Ms. Smith told Sergeant Biddle she did not see the gunman. At trial, Ms. Smith explained why she had denied seeing the assailant: "I was afraid, and I didn't want to be considered a snitch. [I was afraid] [t]hat the same thing might happen to me." At first, when interviewed by Sergeant Biddle, Ms. Smith refused to answer questions about "Aaron," the name by which Ms. Grimes knew defendant. Ms. Smith subsequently admitted, however, that "Aaron" was defendant whose true name was Floyd. Ms. Smith admitted to Sergeant Biddle that defendant was her boyfriend.

With Ms. Smith's permission, Sergeant Biddle searched her bedroom. Sergeant Biddle found a bag belonging to defendant. The bag contained three live .38-caliber lead wadcutter bullets. As Sergeant Biddle later learned, the two bullets recovered from Marco's body were also .38 caliber wadcutter bullets. All five bullets were of similar design and construction. Sergeant Biddle also found bank records in Ms. Smith's bedroom. Those records led him to believe Ms. Smith had committed bank fraud. Sergeant Biddle arrested Ms. Smith. A few days later, defendant posted bail for Ms. Smith.

Sergeant Biddle interviewed defendant on May 14, 2007. Defendant said that on the night of the murder, he went to Ms. Smith's apartment. Defendant was accompanied by a friend named Eric. Ms. Smith told defendant she had a date. Defendant told Sergeant Biddle it was a working date Ms. Smith had arranged. Defendant thought

6

Ms. Smith left the apartment around 6:30 or 7 p.m. During the interview with Sergeant Biddle, defendant described what happened after Ms. Smith left the apartment: "She left. Me and [Eric] chilled for a minute. I was like, what you going to do? He was like maybe take to the house. I dropped him off. . . ." Defendant dropped Eric off at home and went to Sepulveda Boulevard in Van Nuys. He stayed in the San Fernando Valley until after 1:30 a.m. Defendant spent the night with his girlfriend, Tyquana Edwards, at the El Segundo Inn. They arrived at about 2 a.m. Defendant admitted ownership of the bullets Sergeant Biddle found in Ms. Smith's bedroom. Defendant denied, however, that he owned a gun. During the May 14, 2007 interview, defendant said he found the .38 caliber wadcutter bullets in a flower bed.

Mr. Garcia viewed a photographic lineup on May 22, 2007. Mr. Garcia told Sergeant Biddle that two people, including defendant, looked something like the man who drove away the night Marco was shot. He wrote: "This number 3 looks something like the person I seen on the night of the shooting. It looks something like him." Mr. Garcia further wrote: "Also number 4 looks like him." When shown the photographic lineup by Sergeant Biddle, Mr. Garcia was asked, "So what I gather when I read this, you're relating number 3 looks more like the guy then number 4?" Mr. Garcia responded, "If I have to [choose] between one and the other, I would probably pick number 3." When Mr. Garcia testified on July 16, 2012, he had a difficult time recalling the precise identification he made on May 22, 2007. Sergeant Biddle also showed Mr. Garcia a watch. The watch had been found in defendant's car several days after Marco's murder. Defendant admitted it was his watch. When Mr. Garcia saw the watch he said: "Oh my lord, that looks like it, yeah. That looks like it." According to Sergeant Biddle, Mr. Garcia sounded confident.

As noted, Sergeant Biddle interviewed defendant on May 14, 2007. During that interview, defendant claimed he was in the San Fernando Valley on May 6, 2007, at 1:30 a.m. This was the time Marco was murdered. However, cellular telephone records showed defendant's telephone was in Hawthorne on May 5, 2007, at 9:54 p.m. and 10:24 p.m. At 1:59 a.m. on May 6, 2007, defendant's cellular telephone was in Pasadena. It

7

would have taken defendant approximately 23 minutes to get from the murder scene to Pasadena. Between 10:24 p.m. on May 5, 2007, and 1:59 a.m. on May 6, 2007, defendant's cellular telephone did not make or receive any telephone calls in the San Fernando Valley.

### 3. Events Following The Murder

Ms. Smith's brother, Tiarou Smith, visited her at the sheriff's station.[3] After speaking with her, he formed the opinion she was lying. He encouraged her to tell the truth. Tiarou spoke with Sergeant Biddle. Tiarou said he doubted his sister's veracity.

While Ms. Smith was in jail, defendant drove to Long Beach and picked up a 14-year-old prostitute, Nadie B. Defendant demanded Nadie tell him her true age because, "I have a lot of shit over my head." Nadie was with defendant when he posted Ms. Smith's bail. After bail was posted, defendant, Ms. Smith and Nadie spent the night in the Los Angeles area. The following day, they drove to Oakland. During the drive north, defendant asked Ms. Smith what Sergeant Biddle knew about the murder. Ms. Smith told defendant she had not identified him as the person who shot Marco. Defendant expressed the view that the police did not have anything on him.

While in Oakland, Nadie overheard defendant speaking on the telephone. Defendant said he had shot and killed someone. But he did not think Ms. Smith would talk. And he did not think law enforcement officers had the gun used in the murder. Nadie testified: "He said that he shot and killed someone. And that—he didn't know if they had the gun or not, and as far as the—they didn't have enough evidence against him."

---

[3] Because they have the same surname, to avoid confusion, we refer to Ms. Smith's brother, Tiarou, by his first name.

Tiarou was unable to locate his sister, Ms. Smith, after she was released from custody. He did not know who had posted her bail. On May 11, 2007, with Sergeant Biddle's assistance, Tiarou made a missing person report to the police.

Also while in Oakland, Nadie had an argument with defendant. Because she was angry at him, she decided to telephone the police. On May 12, 2007, at approximately 12:41 a.m., Nadie spoke with an Oakland police emergency operator. In that conversation, Nadie said her name was Michelle Williams. Nadie told the operator defendant was wanted for murder. She gave the operator defendant's first name, a physical description, his location, a description of his car—a gold Chevrolet Impala with chrome rims—and a partial license plate number.

After spending about a week in Oakland, defendant, Ms. Smith and Nadie returned to Los Angeles. The date was May 13, 2007. Shortly after they arrived, they were stopped by police officers. Defendant was arrested for being a felon in possession of ammunition. Ms. Smith was detained due to her brother's missing person report. Nadie was transferred to the custody of the Department of Children and Family Services. Following his arrest, defendant asked Ms. Smith to tell law enforcement officers she found the wadcutter bullets on the car and planned to get rid of them but had not done so.

Sergeant Biddle learned defendant, Ms. Smith and Nadie were in custody. Just after midnight on May 14, 2007, Sergeant Biddle interviewed defendant. Defendant said he was driving the Impala because his Monte Carlo needed repair. Defendant acknowledged he had been at Ms. Smith's apartment the night of the shooting. Defendant said that after Ms. Smith left on her prostitution date, he went to the San Fernando Valley until about 1:30 a.m. Then he drove to Pasadena to pick up his girlfriend, Ms. Edwards. Defendant admitted the wadcutter bullets were his. He said he found them in a flowerbed somewhere. Also on May 14, 2007, Sergeant Biddle searched defendant's Impala. Defendant's watch, the one identified by Mr. Garcia, was in the center console. Sergeant Biddle also found two magazines titled "Combat Arms" and "Guns, Weapons." A sticker on the Impala's rear window read, "All on a bitch."

9

Later that day, May 14, 2007, Sergeant Biddle interviewed Ms. Smith. He asked if she was afraid and whether she was being forced to do anything against her will. Ms. Smith denied that anything was amiss. She refused to answer other questions and was released.

### 4. Defendant and Ms. Smith Are Charged With Murder

Three years later, on August 31, 2010, Deputy District Attorney Cynthia Barnes filed a felony complaint naming defendant and Ms. Smith. Sergeant Biddle interviewed defendant at 3:10 p.m. on that date. Sergeant Biddle engaged in a ruse. Sergeant Biddle described the ruse, "I used a ruse, and told him that we were meeting with [Ms. Smith's] attorney the next day, and asked him what he thought [Ms. Smith] was going to tell us, because the attorney represented to us [Ms. Smith] was finally going to tell us the truth."

On September 2, 2010, Sergeant Biddle arrested Ms. Smith for Marco's murder. At first Ms. Smith insisted she did not see the killer. Ultimately, however, she told Detective Biddle it was defendant who shot Marco. Ms. Smith then telephoned her mother. The conversation included the following: "[Ms.] Smith: . . . I just told them what happened. I just never did because I was afraid, so. [¶] [Mother]: So you know about it? [¶] . . . [Ms.] Smith: Yeah. [¶] [Mother]: You did? [¶] [Ms.] Smith: I - - Yeah. [¶] [Mother]: So they going to let you go? [¶] [Ms.] Smith: Well, they said that they're going to talk to the DA about it and see if - - [¶] [Mother]: So why did they let you talk? [¶] [Ms.] Smith: Huh? [¶] [Mother]: So what did they tell you to make you talk? [¶] [Ms.] Smith: I don't want to be involved in - - I don't want to be no snitch . . . . [¶] [Mother]: Oh, okay. So we can't come and get you? [¶] [Ms.] Smith: I don't think so. [¶] [Mother]: They don't drop the charges? [¶] [Ms.] Smith: Well, they have to talk to the DA and they - - [¶] [Mother]: And then you're going to be a witness? [¶] [Ms.] Smith: Yeah." Ms. Smith subsequently entered into proffer and immunity agreements with the prosecution. She agreed to enter an open guilty plea to being an

10

accessory after the fact in violation of section 32. She faced a sentence of up to three years in state prison. She agreed to tell the truth at the preliminary hearing and at trial.

### 5. Defendant's Subsequent Communications While In Custody

Jennie Martin, known as "Gigi," met defendant in June 2010 while he was in custody. They became boyfriend and girlfriend. On August 31, 2010, at 5:47 p.m., less than three hours after speaking with Sergeant Biddle, defendant telephoned Ms. Martin. Defendant said he had just come from speaking to detectives. He said they were trying to charge him with murder. Defendant told Ms. Martin, "Call this number and say your nephew Money on the phone." Defendant then spoke to someone he called "Auntie." Defendant asked "Auntie" to find out what was happening with a niece. He told "Auntie," "[L]oose lips sink ships." He told "Auntie," "I would greatly appreciate it if . . . you know what I'm saying, if you would reach out and connect the dots and see what's going on." Defendant then directed Ms. Martin to telephone an uncle. Defendant told Ms. Martin to let the uncle know what was going on but not to talk too much.

Two days later, on September 2, 2010, at 3:23 p.m., defendant told Ms. Martin to call "Auntie," "The one you've been calling and she been, you know, doing this and that." Defendant and Ms. Martin discussed what Ms. Martin should say: "[Defendant]: Tell her it's just sunny with no clouds just as long as the weather storm doesn't come to town. [¶] [Ms.] Martin: Sunny, okay. [¶] [Defendant]: Yeah, as long as the storm doesn't blow in there won't be no chance of rain. [¶] [Ms.] Martin: Okay. [¶] [Defendant]: Yeah, and as long as there's no thunder, everything should be okay. [¶] [Ms.] Martin: Okay. [¶] [Defendant]: Yeah. And I mean she – she should really understand what I'm talking about. If not, she should have a clue. [¶] . . . [¶] [Defendant]: [R]ight now in this situation I wish my uncle was here, man, on everything I love. [¶] [Ms.] Martin: It'll happen, don't' worry. [¶] . . . [¶] . . . [T]hey're looking for that storm system in the daylight -- [¶] [Defendant]: . . . [Y]ou understand what I'm talking about? [¶] [Ms.] Martin: Uh-huh. [¶] [Defendant]: Yeah, they looking for that

11

storm system in the daylight with a flashlight, believe that. [¶] [Ms.] Martin: Okay. [¶] [Defendant]: Yeah. [¶] [Ms.] Martin: What is wrong with her? [¶] [Defendant]: So as long as the weather man say clear sky, I'm straight." At trial, Sergeant Biddle offered an opinion as to the import of the conversation between defendant and Ms. Martin. Sergeant Biddle believed the foregoing was defendant's attempt to verify that Ms. Smith was not in custody. Sergeant Biddle testified, "[M]y impression [was] that [defendant] was saying as long as [Ms. Smith] was not in court, everything was good for him."

In a September 10, 2010 conversation at 2:24 p.m., defendant told Ms. Martin, " . . . I got to tell my cousin though, I'm going to keep it real light, baby, I'd like to look out for this other person too while I'm in jail just to make sure she – you know what I'm saying, those streets are ugly." Defendant said: "I got all the info at least on my cousin . . . [¶] . . . [¶] . . . Yeah. It's like 20 bucks a week or some, nothing too much, so it ain't too heavy on them for like $20 a week . . . ." Defendant told Ms. Martin to call his cousin Monique. When Monique came on the line, defendant told Monique to visit Ms. Smith in jail and say, "I'm going to have – I'm going to have Uncle . . . or Demetrius put some money on her books every week, but she ain't got to trip, you feel me?" Defendant told Monique, "[J]ust talk to her and see what's going on." After his conversation with Monique, defendant told Ms. Martin to find out the visiting days and hours at the jail. Defendant instructed Ms. Martin to let Monique know about the visitation hours and days. He urged Ms. Martin to, "Tell [Monique] to find out if it's clear skies, partly cloudy, is it hailing, lightning, thunderstorms, is there all that type of . . . too."

Later that day, at 9:20 p.m., defendant called Ms. Martin to follow up on his earlier request. Defendant told Ms. Martin: "When we get off the phone, text [the visiting information] . . . to my little cousin . . . and tell her to make sure she gets up here. And then text my uncle and tell him, . . . if he's cool, like put $20 a week on the books over there. [¶] . . . [¶] . . . I'm trying to make the – make the stay as comfortable as possible so that, . . . it ain't easily influenced by the outer source." Defendant urged Ms. Martin to make sure his cousin went to visit Ms. Smith in jail. He suggested

12

Ms. Martin accompany the cousin: "That way, because she knows that person so that way they can talk, . . . and you can kind of just go with her so she can know what's up."

Two days later, on September 12, 2010 at 6:48 p.m., defendant had another conversation with Ms. Martin. Defendant asked Ms. Martin to find out how much a subscription to Vogue or Glamour would cost. He commented: " . . . I'm just thinking of everything so the motherfuckers can be comfortable. So the motherfuckers . . . don't let the pressure . . . crack like a hardboiled egg." Defendant also asked Ms. Martin to e-mail his "boy" and "let him know where I'm at and shit like that, tell him come holler at me under the ASAP." Defendant commented, "And shit will run a little bit more smoother." Defendant further instructed Ms. Martin to call an uncle. Defendant said, "I want to check in on my little cousin just to make sure she ain't in the streets." Defendant then conversed with an unidentified male: "[Defendant]: Did you ever get in contact with my cousin? [¶] Male: Hang on. Not with my niece. . . . [¶] . . . [¶] [Defendant]: I'm trying to do – I'm trying to – I'm going to say this kind of quick though, you know what I'm saying, that way keep your antennas up. I'm doing what I can as far as on my end, you feel me, to make sure everything is copasetic over that way because they got the girl's ass, you know what I'm saying, booked down over here, brother. [¶] Male: Right. [¶] [Defendant]: Yeah. . . . I'm doing what I can, you know, . . . [¶] . . . [¶] . . . But you know, if it's feasible, I'm going to need . . . like every other week if you could, just like hit her books with like 20 bucks or something, . . . that way . . . [¶] . . . [¶] . . . That way everything will be A-One . . . make the motherfuckers stay comfortable, you feel what I'm talking about? [¶] . . . [¶] . . . [I]f you could every other week, shoot ___ over that way so that way . . . the motherfucker will be comfortable . . . and they ain't trying to . . . break under this storm right here . . . ."

Anthony Cheval met defendant, known as "Dinero," in jail. On September 28, 2010, Mr. Cheval was scheduled to appear in court in the Antelope Valley. When in the courthouse, he had access to a telephone. Defendant asked Mr. Cheval to telephone Ms. Martin from the courthouse. Mr. Cheval was to tell Ms. Martin that defendant loved her. Defendant wanted the message conveyed to Ms. Martin that she should continue to

13

do what he asked of her. Mr. Cheval took notes of his conversation with defendant. Mr. Cheval wrote down, "For Dinero, G.G."; a telephone number. Mr. Cheval later wrote: "'Don't stress and continue to do all as I asked. I love you.'" In the recorded conversation between Mr. Cheval and Ms. Martin, Mr. Cheval said: " . . . [Defendant] asked me to call you and just let you know that he okay, and not to stress out, and he just said he loves you and continue what he asked you to do . . . . [¶] . . . [¶] . . . [H]e said to continue to do everything he asked . . . . [¶] . . . [H]e said don't stress. Don't stress out, don't trip, it'll be okay."

Ms. Smith was traveling from court back to the jail one day by bus. A man in the back of the bus began to yell Ms. Smith's name. He passed a necklace to the front of the bus where Ms. Smith was seated. Ms. Smith did not accept the necklace. The unidentified man in the back of the bus said, "Floyd said not to listen to the D.A." (This statement was admitted for the effect it had on Ms. Smith's state of mind.) Ms. Smith felt scared.

While in county jail custody, Ms. Smith received several letters from defendant. Ms. Smith read the letters. Ms. Smith was asked, "[A]fter reading them, did you give them to your lawyer?" Ms. Smith responded, "Yes." In a later dated September 8, 2010, defendant wrote: "Dear Evelyn. If you're reading this, you're in a fucked up position, just like I am. First, I want to say sorry for all of this. I'm sorry about how things ended between us. Your car, your job, and your life. [¶] I made a bad decision loving Tyquana and not listening to you, not putting my heart and trust in your arms." In another letter, defendant said: "No intentions to change what you say or feel. I want you to stay—your course. I only tried to make your stay comfortable by sending people you know to see you and putting money on your books. Also, when you were on the bus, that guy yelling your name had a handmade chain for you. It was a heart with both our names on it. You know me just like I know you, and you allowed them to make you believe something that—you tried to use me as a way out of jail. You know if I could, I would—would have bailed you out so you could be at home." Defendant signed the letter, "Jeremiah's Dad." Ms. Smith explained that defendant thought—incorrectly—that she had been

14

pregnant by him.  Jeremiah was the name defendant chose for the child.  Ms. Smith acknowledged that in some of his letters, defendant said he loved her.  She testified, "For me, it was as though he was trying to sweet-talk me to kind of do what he wanted me to do."

On January 11, 2012, while awaiting trial, Sergeant Biddle went to defendant's jail cell.  Defendant asked Sergeant Biddle how the weather was in a specific city.  Sergeant Biddle took the question as a threat or intimidation.  This was because Sergeant Biddle did in fact live in the city named by defendant.  The location of Sergeant Biddle's residence was confidential information.  As a result, Sergeant Biddle took additional steps to ensure his safety and that of his family.

### B.  The Defense Case

### 1.  Dr. Mitchell Eisen

Dr. Eisen had a Ph.D. in psychology.  Dr. Eisen testified concerning eyewitness memory.  He discussed limits on attentional capacity.  Dr. Eisen described the retrieval process and memory function.  He observed, among other things, that memory declines when people are in their 70s.  Dr. Eisen further discussed eyewitness memory in the specific context of a photographic lineup.

### 2.  Randy Lee

Mr. Lee was a Honda salesperson.  He explained the manner in which a Honda Element could be locked without a key.  The only way to lock the car when the key was on the front passenger seat was to:  open the driver's door; press the locking mechanism on the door; and close the door.

15

### 3. Anthony Paul

Mr. Paul was a firearms examiner. Mr. Paul had examined the bullets recovered by the coroner as well as those found in Ms. Smith's apartment. His findings were consistent with those of the law enforcement firearms examiner. The bullets recovered by the coroner had been fired from the same weapon. All of the bullets examined were very similar in terms of design.

### 4. Defendant

Defendant admitted he was known by the names Aaron and Dinero in addition to his true name. He did not want other women to know his real name because he was involved in a relationship at home. He lived with his fiancée, later his wife, Ms. Edwards. In April 2007, defendant had three women working for him as prostitutes. Ms. Smith was one of those women. Defendant described his movements on May 5 to 6, 2007. He left Ms. Smith's apartment at about 10:30 p.m. Defendant knew she had a date. He did not know whom the date was with. Defendant had never previously met Marco. He believed it was a prostitution date. Defendant did not see Ms. Smith get into Marco's car. He drove to the San Fernando Valley, to an area where prostitutes work. Defendant went there to recruit women. After an hour or two, he left. Defendant drove to Pasadena to pick up Ms. Edwards. He received a message from Ms. Smith the following day saying she was in jail on a grand theft charge. Defendant denied he had anything to do with the bank fraud. Defendant posted Ms. Smith's bail. Ms. Edwards, who was employed, signed the bond. Defendant picked up Ms. Smith around midnight. They drove to Oakland. Nadie was with them. He had picked her up in Long Beach. Nadie wanted him to be her pimp. During the ride to Oakland, Ms. Smith told defendant her date had been shot. She also said the police had been asking about defendant. After several days, they left Oakland and returned to Los Angeles.

After his arrest for the May 6, 2007 killing, defendant discovered Ms. Smith had entered into a plea agreement and was naming him as the murderer. Defendant spoke with friends and family. He needed something to substantiate the fact that Ms. Smith was lying. On May 6, 2007, between 1:15 and 1:31 a.m., defendant testified he was on Sepulveda Boulevard in the San Fernando Valley. He got there around 11:30 p.m. Defendant admitted writing several letters to Ms. Smith. Defendant was asked why in a September 8, 2010 letter to Ms. Smith, he never accused her of lying about his complicity in the killing. This was eight days after Ms. Smith had accused defendant of killing Marco. At no time in the September 8, 2010 letter did defendant mention anything about Ms. Smith lying or falsely accusing him of the killing. Defendant did not confront her about it. He admitted he attempted to arrange things so Ms. Smith would be more comfortable in jail. Defendant admitted lying to Sergeant Biddle about finding the .38-caliber bullets in a flower pot. In fact, Ms. Smith had found them on the car she had purchased for him, the Monte Carlo. The car was parked in front of her apartment at the time. Defendant told her to hold on to them so he could see them. Defendant lied about finding the bullets because he was raised to not cooperate with law enforcement officers. Defendant did, however, eventually tell Sergeant Biddle the truth. Defendant said he thought the bullets were a sign of some kind.

Defendant related a theory about Marco's murder to Sergeant Biddle. Defendant believed a competing pimp had killed Marco. The killing occurred in the mistaken belief Marco was defendant. While this trial was in progress, defendant intentionally told Sergeant Biddle a different, untrue version of the events surrounding Marco's murder. Defendant explained his motivation. " . . . I needed to . . . prove that this dude [Sergeant Biddle] will believe anything to convict me of a case." When describing at trial the false story presented to Sergeant Biddle, defendant was asked, "[D]id you tell [him] that although you did not kill Marco . . . , you help set him up to be killed?" Defendant responded, "Yes, I did." Defendant told Sergeant Biddle a friend gave him $20,000 to kill Marco. Defendant said he hired two gang members to commit the killing and paid them $7,500. He kept the rest of the money for himself. Defendant further informed the

17

detectives that Ms. Smith was his accomplice.  Defendant arranged for Ms. Smith to meet Marco.  She then set up the date with Marco and telephoned defendant.  Ms. Smith wanted to let defendant know where they were.  She then locked the keys in Marco's car in order to lure him out of the apartment.  Defendant testified Sergeant Biddle never denied believing this story.

## C.  Rebuttal

### 1.  Queenmonique W.

Queenmonique met defendant when he was visiting her neighbor.  During their first conversation, defendant asked Queenmonique whether she was old enough to vote.  She told him she was not.  The second time Queenmonique encountered defendant, he came into her apartment, orally copulated her and had sexual intercourse with her.  Afterward, he told her there would be trouble if he heard about her being with someone else.  He said her "pussy" belonged to him.  Defendant admitted the oral copulation occurred, but denied he had sexual intercourse with Queenmonique.  He denied making the statements she attributed to him.

### 2.  Sergeant Biddle

Sergeant Biddle testified concerning some of defendant's statements.  On August 10, 1010, defendant told him Ms. Smith had found the bullets on top of the Monte Carlo when it was parked near her apartment.  Defendant said he told Ms. Smith to take the bullets into her apartment.  Sergeant Biddle also acknowledged that defendant had offered the competing pimp murder theory.  Sergeant Biddle investigated but was unable to corroborate defendant's story.  Sergeant Biddle also investigated defendant's subsequent murder for hire explanation.  He was unable to corroborate the underlying

facts. In their conversations, Sergeant Biddle never said anything that evinced a belief defendant did not kill Marco.

## III.  DISCUSSION

### A.  Ms. Smith's Testimony

Defendant asserts a violation of his due process rights in that the prosecution knowingly introduced Ms. Smith's perjured testimony. Defendant argues the error was compounded by evidence Ms. Smith's immunity agreement required truthful testimony. We conclude:  defendant forfeited the argument by failing to raise it in the trial court; defendant has not shown knowing use of perjured testimony; and any error was harmless.

The prosecution's knowing use of perjured testimony violates a defendant's due process rights. (*Napue v. Illinois* (1959) 360 U.S. 264, 269; *People v. Vines* (2011) 51 Cal.4th 830, 873; *People v. Sakarias* (2000) 22 Cal.4th 596, 633.) Here, however, defendant forfeited his perjured testimony contention by failing to raise it in the trial court. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 167; *People v. Wilson* (2008) 44 Cal.4th 758, 800.) The issue is not properly before us.

Even if the issue was properly before us, we would not find reversible error. Our Supreme Court has held, "[A] conviction will be reversed if it was obtained by evidence that the prosecution knew or should have known was false (e.g., *United States v. Agurs* (1976) 427 U.S. 97, 103) . . . ." (*People v. Mayfield* (1997) 14 Cal.4th 668, 735.) "When the prosecution [introduces and then] fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is *any reasonable likelihood* the false testimony could have affected the judgment of the jury. This standard is functionally equivalent to the '"harmless beyond a reasonable doubt"' standard of *Chapman v. California* (1967) 386 U.S. 18. (*In re Jackson* (1992) 3 Cal.4th 578, 597-598[, disapproved on a different point in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6].)" (*People v. Dickey* (2005) 35 Cal.4th 884, 909.)

19

Defendant has not shown that Ms. Smith's testimony was false or the prosecution knew or should have known it was false. (See *People v. Vines, supra,* 51 Cal.4th at pp. 874-875; *People v. Morrison* (2004) 34 Cal.4th 698, 716-718.) Defendant rests his knowing falsity contention on Ms. Smith's testimony that: she did not tell defendant about her relationship with Marco; she did not tell defendant her May 5, 2007 date with Marco was a non-prostitution date; defendant did not answer his cellular telephone when she called him at 1:13 a.m. on May 6, 2007; and she *accidentally* locked the key in Marco's car. Defendant asserts Ms. Smith's testimony on these points contradicted the prosecution's theory—Ms. Smith was an accomplice who intentionally set Marco up to be murdered.

We reject defendant's argument. First, the prosecution did not present this case to the jury on a theory Ms. Smith was an accomplice to the murder. The theory Deputy District Attorney Teresa Magno presented to the jury was that defendant committed the killing because of his need to control Ms. Smith. Defendant was threatened by Marco's presence. Also, Marco threatened her economic value to defendant as a prostitute. Ms. Magno argued: "[T]he night the shooting happened, [defendant] for the first time saw [Ms. Smith] exerting some sort of free will[.] [¶] That for the first time since they met together, the defendant saw [Ms. Smith] going out on a date. [¶] I submit to you that he saw that as a threat to not just [Ms. Smith], but his money-making enterprise. That was the reason why he killed Marco Smith." In her argument, Ms. Magno emphasized all the evidence corroborated Ms. Smith's testimony. Ms. Magno urged the jury to accept Ms. Smith's version of the events leading up to Marco's murder.

Second, the evidence was consistent with the prosecution's theory. Defendant exhibited controlling behavior toward Ms. Smith. After the first time they were intimate, defendant told Ms. Smith his time was money and she would have to pay him to see her. Defendant persuaded her to give him a key to her apartment so that he had access to it at all times. He had her obtain a tattoo that read, "V.I.P. Missus." Defendant routinely drove her to and from locations where she engaged in acts of prostitution. He required that she check in with him nightly. Further, it would not have been necessary for

20

Ms. Smith to tell defendant about Marco or about any of their dates. It was undisputed defendant was at Ms. Smith's apartment when she left with Marco. And there was evidence defendant waited nearby for Ms. Smith to return home. The jury could reasonably infer defendant kept close track of Ms. Smith's activities. Moreover, he saw Ms. Smith and Marco leave and, later, observed their return. On this record, we cannot conclude Ms. Smith's testimony was false or that the prosecution knew or should have known so. Defendant fails to establish the prosecution knowingly presented false testimony. No due process violation occurred. (See *People v. Vines, supra,* 51 Cal.4th at pp. 874-875; *People v. Morrison, supra,* 34 Cal.4th at pp. 716-718.)

Finally, any error was harmless. Even if the jury believed Ms. Smith was an accomplice, it is not reasonably probable any false testimony concealing that fact affected the judgment. Ms. Smith was charged with being an accessory to the murder after the fact. The jury was instructed that Ms. Smith was an accomplice to murder whose testimony must be corroborated by other evidence.[4] Even if the jury believed Ms. Smith participated in the murder, defendant still lay in wait for and then shot Marco. Even if her denial she participated in the murder was false, the jury still had to decide whether defendant shot Marco. Under these circumstances, even if the jury believed Ms. Smith aided the murder, it was not likely the jury would have convicted defendant of anything less than first degree murder. (See *In re Cox* (2003) 30 Cal.4th 974, 1011; *In re Malone* (1996) 12 Cal.4th 935, 967; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1224-1225.)

---

[4] The jury was instructed: "An accomplice is a person who is, or could be, subject to prosecution for the identical crime charged against the defendant. If the crime of murder was committed, then Evelyn Smith was an accomplice to that crime since she was charged with that offense. [¶] You may not convict the defendant or murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes."

It also was not improper for the prosecution to present evidence and argue to the jury that Ms. Smith's proffer and immunity agreements obligated her to tell the truth. Prior to trial, defendant brought a motion to redact Ms. Smith's immunity and leniency agreements insofar as they discussed her obligation to testify truthfully. The trial court denied that motion. In her closing argument to the jury, the deputy district attorney, Ms. Magno, argued: "Another factor that you have to consider, too, is that Evelyn Smith was the recipient of a proffer or leniency agreement. I'm sure [defense counsel] Mr. Welbourn will jump up and down and argue that you know what, this pressured her to tell the truth - - I'm sorry, this pressured her to tell a lie. [¶] But the opposite is true. The leniency agreement and the proffer agreement, you're going to have copies of it in the jury room. I urge you to read the details of the contract. [¶] And in these contracts, you will see that she was not required to identify the defendant as the shooter in all proceedings. In fact, the language is very clear that all that was expected of her was to tell the truth. [¶] And whether or not she's telling the truth will not be up to Sergeant Biddle nor the district attorney's office, but up to the judge. [¶] This is - - the contract is basically an ironclad, legally binding contract that protects her if she told the truth, whatever the truth may be. [¶] And I submit to you that this leniency agreement actually allowed her to tell the truth, and not to tell a lie."

Ms. Smith was a key witness against defendant. Her credibility was, therefore, a highly relevant issue. The terms of her proffer and leniency agreements were relevant to her credibility. (*People v. Williams* (2013) 56 Cal.4th 165, 192; *People v. Bonilla* (2007) 41 Cal.4th 313, 337.) Moreover, there was no improper vouching for Ms. Smith's veracity. As our Supreme Court observed in *Williams*: "The prosecutor did not place the prestige of the government behind [the witness] through personal assurances of veracity, or suggest that information not presented to the jury supported [the witness's] testimony. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1167[, overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22]; *People v. Fierro* (1991) 1 Cal.4th 173, 211.) It is settled that making a record of the terms of a plea agreement requiring a witness to tell the truth does not constitute impermissible vouching. (*People v. Frye*

(1998) 18 Cal.4th 894, 971-972[, overruled on a different point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22]; see [*People v.*] *Bonilla, supra,* 41 Cal.4th at pp. 336-337.)" (*People v. Williams, supra,* 56 Cal.4th at p. 193.) The jury was instructed the prosecution does not "vouch" for any witness; further, that Ms. Smith's immunity grant did not make her more or less credible.[5] We presume the jury followed those instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 73; *People v. Boyette* (2002) 29 Cal.4th 381, 436.)

Any error in admitting evidence Ms. Smith was required by agreement to testify truthfully was harmless. (*People v. Fauber* (1992) 2 Cal.4th 792, 822; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Substantial evidence corroborated Ms. Smith's testimony. Nothing in the proffer or immunity agreements obligated her to identify Marco's killer. Moreover, there was very substantial evidence of defendant's guilt. The verdict would not have been more favorable to defendant had the jury been uninformed about Ms. Smith's contractual obligation to testify truthfully.

### B. The Prosecutor's Argument

Defendant argues Ms. Mango violated his due process rights in her argument to the jury. Defendant asserts Ms. Mango argued that the motive for the killing arose from Marco's developing relationship with Ms. Smith. Ms. Mango argued defendant's ability to control Ms. Smith was threatened by the budding relationship with Marco. The relationship, Ms. Mango reasoned, also affected defendant's ability to reap profits from Ms. Smith's prostitution activities. Thus, Ms. Mango argued, these factors collectively

---

[5] The jury was instructed: "The fact that a witness was granted immunity does not necessarily make the witness more or less credible. You may consider the fact that a witness was granted immunity in your evaluation of credibility along with other factors. [¶] The prosecution does not 'vouch' for any witness, nor does the court by permitting a witness to testify under a grant of immunity. The court merely ensures that the rights of the parties and the witness are protected by balancing their competing interests."

served as a motive for Marco's killing. The asserted due process denial arises, in defendant's view, because no evidence supported such an argument to the jurors. Specifically, defendant argues there was no evidence: Ms. Smith's relationship with Marco was anything other than a casual, platonic friendship; prior to the night of the murder, he had any reason to believe Ms. Smith, in his words, "was straying from the 'stable'"; he had ever been violent in an attempt to control his prostitutes; or that he knew who Ms. Smith was seeing on the night of the killing.

Defendant concedes he failed to object to Ms. Magno's argument. He contends, however, that no objection was required relying on *People v. Kirkes* (1952) 39 Cal.2d 719, 722-724. We disagree. Our Supreme Court has repeatedly held that absent an excuse from objecting, the failure to object to prosecutorial misconduct in closing argument forfeits any issue that could have been raised on appeal. (E.g., *People v. Vines, supra,* 51 Cal.4th at p. 872; *People v. Gamache* (2010) 48 Cal.4th 347, 371; *People v. Panah* (2005) 35 Cal.4th 395, 462, 463; *People v. Boyette, supra,* 29 Cal.4th at p. 432.) A defendant claiming an exception applies must demonstrate support therefore in the record. (*People v. Gamache, supra,* 48 Cal.4th at p. 371; *People v. Panah, supra,* 35 Cal.4th at p. 462.) Defendant has not demonstrated that any exception to the objection requirement applies in this case. Even if the issue was properly before us, we would reject defendant's contention for the reasons discussed above. The prosecution's theory was consistent with the evidence. (*People v. Thornton* (2007) 41 Cal.4th 391, 454; *People v. Willard* (1907) 150 Cal. 543, 552.)


## C.  Queenmonique's Testimony


Defendant asserts error in admitting Queenmonique's testimony about the sex offenses defendant committed against her and his comments to her at that time. We find no prejudicial error.

Prior to the retrial of the murder count, the prosecution moved to introduce Queenmonique's testimony in its case in chief as evidence of motive and intent under

Evidence Code section 1101, subdivision (b). The trial court denied the motion. At trial, Ms. Magno sought to question defendant about his conduct with Queenmonique, which led to a lewd and lascivious conduct conviction. The fact of the conviction had already been admitted in evidence, without reference to Queenmonique's name. In response to a defense objection, Ms. Magno argued defendant's statement to Queenmonique—that her "pussy" belonged to him—was admissible under Evidence Code section 1101, subdivision (b) as relevant. Ms. Magno argued this evidence was relevant as to the issue of defendant's intent. The trial court inquired: "Your theory here is - - you want to confront him with your theory of the case, which is that he's a controlling individual, and that since he was losing control over [Ms. Smith] to a love interest, that's the reason he shot the victim?" Ms. Magno responded: "Yes. Relevant as to intent." The trial court allowed Ms. Magno to inquire. The following transpired: "Q [By Ms. Magno]: Do you know Queen W? [¶] A Yes, I do. . . . [¶] Q . . . Queen W is someone you had sex with; correct? [¶] A Oral copulation, yes. [¶] Q It was just oral copulation? You actually . . . had sexual intercourse with her? [¶] A Well, that's what they allege, yes. [¶] Q You're saying it did not happen? [¶] A Yes. [¶] . . . [¶] Q . . . Didn't you tell her that her 'pussy belonged to you?' [¶] . . . [¶] A No. . . . [¶] Q Didn't you also tell her that if you started hearing about her giving her pussy to someone else, quote/unquote, 'We're going to have problems?' [¶] A No. . . . [¶] Q So you're denying this? [¶] A I never said that." Ms. Magno introduced Queenmonique's testimony in rebuttal as evidence of defendant's intent and motive. On appeal, however, the Attorney General argues the evidence was admissible as relevant to defendant's credibility.

We need not determine whether the trial court erred or abused its discretion. Any error or abuse of discretion was harmless. The evidence was not particularly inflammatory in light of other evidence presented in this case. The jury heard evidence, for example, that defendant was a pimp whose prostitutes included a 14-year-old girl. The evidence of his conduct with Queenmonique was briefly presented. Defendant admitted he had been convicted of a felony as a result of it. Ms. Magno did not rely on Queenmonique's testimony in her closing argument. Moreover, there was very credible

25

evidence of defendant's guilt. Ms. Smith was a prostitute who worked for defendant. Defendant was present when Ms. Smith left on a non-working date with Marco. Mr. Garcia observed a man matching defendant's general description. The man was driving a car that matched the description of defendant's car in the vicinity of Ms. Smith's apartment just prior to the murder. The man repeatedly looked in the direction of Ms. Smith's home. The man was present around the time Ms. Smith returned home with Marco, when Mr. Garcia heard shots fired. Ms. Smith, an eyewitness, identified defendant as the person who shot Marco. Defendant was in possession of bullets of the same type as those that killed Marco. Defendant fled to Oakland in the aftermath of the shooting. Further, Nadie heard defendant say that he had shot someone. And, while in custody, defendant attempted to find out whether Ms. Smith was talking about the murder and whether she would turn him in to law enforcement authorities. He wrote love letters to Ms. Smith in an attempt to manipulate her. He pleaded with family members to take steps to ensure Ms. Smith's comfort while in jail to guarantee her silence. He repeatedly changed his story about Marco's murder. Given the evidence in this case, any error in admitting Queenmonique's testimony was harmless.

## D. Custody and Conduct Credit

The trial court awarded defendant 976 days of presentence custody credit and 146 days of conduct credit. However, defendant was arrested on January 9, 2010, and sentenced on September 11, 2012. As a result, he was entitled to 977 days of presentence custody credit. (*People v. Denman* (2013) 218 Cal.App.4th 800, 814; *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) In addition, because he was convicted of a first degree murder committed on May 6, 2007, defendant was not entitled to any conduct credit. (§ 2933.2, subd. (c), eff. June 3, 1998; *People v. Calles* (2012) 209 Cal.App.4th 1200, 1226; *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1431-1432; see *People v. Cooper* (2002) 27 Cal.4th 38, 40, fn. 2.) The judgment must be modified and the abstract of judgment amended to award defendant 977 days of presentence

custody credit and to delete the conduct credit award.  (See *People v. Calles, supra,* 209 Cal.App.4th at pp. 1226-1227; *People v. Wheeler, supra,* 105 Cal.App.4th at p. 1433.)

IV.  DISPOSITION


The judgment is modified to award defendant 977 days of presentence custody credit and zero days of conduct credit.  The judgment is affirmed in all other respects. Upon remittitur issuance, the clerk of the superior court is to prepare an amended abstract of judgment and deliver a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



TURNER, P.J.



We concur:



KRIEGLER, J



KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27